UNITED STATES of America,
Plaintiff–Appellee,

v.

Kamel KAMEL and Musa Khabbas,
Defendants–Appellants.

Nos. 91–1515, 91–1516.

United States Court of Appeals,
Seventh Circuit.

Argued April 8, 1992.
Decided June 16, 1992.

Barry R. Elden, Richard K. Kornfeld (argued), Asst. U.S. Attys., Office of the U.S. Atty., Criminal Receiving, Appellate Div., Chicago, Ill., for U.S.

Ronald C. Smith (argued), Chicago, Ill., for Musa Khabbas.

Kenneth L. Cunniff (argued), Chicago, Ill., for Kamel Kamel.

Before BAUER, Chief Judge, RIPPLE, Circuit Judge, and BURNS, Senior District Judge.*

RIPPLE, Circuit Judge.

On December 19, 1988, a fire destroyed a food and liquor store located in Chicago, Illinois. Evidence subsequently indicated that the fire was intentionally set. The business was owned and operated by two brothers, Kamel Kamel and Musa Khabbas. In January 1990, Mr. Kamel and Mr. Khabbas were indicted by a federal grand jury on five charges arising out of the fire. A superseding six-count indictment was returned in March 1990. At a jury trial held in the United States District Court for the Northern District of Illinois, the two defendants offered alibis and contended that the fire was started by some other, unknown individual or individuals. Nevertheless, the jury returned a conviction of Mr. Kamel on all six of the charged counts and of Mr. Khabbas on one of the six counts. Following their sentencing, Mr. Kamel made a motion for a new trial, which was denied by the district court. These joint appeals by both defendants followed. For the reasons stated below, we affirm.

## I

## BACKGROUND

### A.

In December 1987, Mr. Kamel signed a lease for premises for the Shaban Food and Liquor Store, located on the ground floor of a brick apartment building at 449 West 81st Street in Chicago. Mr. Kamel was listed on the insurance documents and corporate papers as the owner of the business. Mr. Khabbas contributed some capital to the business, and both he and his brother worked in the store on a regular basis.

The value of the inventory kept in the store was disputed, but it ranged from approximately $14,000 to $28,000. Initially, Mr. Kamel insured the contents of the store for $40,000. However, on August 16, 1988, at his request, the amount of coverage of this contents insurance was increased to $60,000.

The store apparently was unprofitable at its 81st Street location. Robert Ellis, an agent for the Internal Revenue Service, testified at trial that in the first six months of 1988, income exceeded expenses in some months, while the reverse was true in other months; he further testified that expenses exceeded income during every month of the second half of 1988. In about August of 1988, Mr. Kamel and Mr. Khabbas began exploring a new location for the business. They finally decided to move to a building located at 8112 South Vincennes Avenue, in Chicago. Negotiations proceeded with the building owner, Samuel Scaife, and, in November 1988, Mr. Kamel signed a lease for this new location, and Mr. Khabbas gave

---

* The Honorable James M. Burns, Senior District Judge for the District of Oregon, is sitting by designation.

Mr. Scaife a check for the first month's rent. The lease was to be effective on December 1, 1988.

In the weeks before the fire at the Shaban Store, several other events took place. The gas company shut off natural gas service to the store on December 1, 1988, and water service was discontinued shortly thereafter. In the middle of December, Diane Malone, who lived near the store, noticed Mr. Kamel and Mr. Khabbas moving inventory out of the store. And, on December 2, Mr. Kamel contacted his insurance broker to inquire about increasing the insurance on the contents of his store yet again, from $60,000 to $80,000, although this change was never in fact made.

### B.

The fire which destroyed the Shaban Food and Liquor Store started at approximately 10 p.m. on December 19, 1988. A key witness at the subsequent criminal trial was Richard Pitts, a bus driver who lived next to the store. Mr. Pitts testified that he arrived home at about 9:30 p.m. and noticed a grey Mustang, which he recognized as belonging to Mr. Khabbas, parked in front of the store. Mr. Pitts also noticed that the store's lights were on but that the store itself was closed. As he was sitting in his home, he heard a loud explosion, raced to the window and saw flames coming from the store. When he ran out of his house, the grey Mustang was no longer parked in front of the store. A few minutes later, Mr. Pitts saw Mr. Khabbas and identified him to John Hafford, a police officer who had responded to the fire. Mr. Khabbas was interviewed by Officer Hafford; Mr. Khabbas told the police officer that he had closed the store at 9 p.m. and returned home, and returned to the store only after he received a phone call about the fire. Mr. Kamel arrived on the scene at about 10:45 p.m. Officer Hafford then interviewed him as well. Mr. Kamel told the police officer that he too had received a phone call at his home about the fire and had come in response.

Although there was a burglar alarm in the store, the alarm was not set on the night of December 19. Furthermore, there usually was a security guard who stayed in the store after it was closed at the end of the business day, but he was absent on the night of the fire.

After the fire was extinguished, City of Chicago fire inspectors and Thomas Peterson, a detective from the Chicago Police Department bomb and arson unit, inspected the building. Their investigation showed that the fire had been deliberately set. They recovered a plastic container, which was determined to contain gasoline residue, as well as debris containing traces of petroleum products. At the trial, one witness suggested that another inflammatory agent might instead have been used to start the fire. The investigators also found that holes had been cut in the floor between the first and second floor of the building, which accelerated the spread of the fire. Later, Robert Schwarz, a fire inspector hired by the insurance company's adjuster, investigated the building. He determined that the fire had been deliberately set by someone who placed some inflammables around the store and then ignited them.

### C.

A few days after the fire, Mr. Kamel called Mr. Scaife to ask him to change the starting date on the lease for the Vincennes Avenue store from December 1, 1988 to January 1, 1989. Mr. Kamel also asked Mr. Scaife to testify, if necessary, that the check given him by Mr. Khabbas was not for rent, but rather for supplies. Mr. Scaife agreed to these requests, and in fact he so testified on October 31, 1989, before a federal grand jury which was investigating the fire. About six weeks later, Mr. Scaife notified the U.S. Attorney's Office that he had lied before the grand jury—including his statement that the lease on the Vincennes Avenue property had not been signed until after the fire—and stated that the lease indeed was effective on December 1, 1988.

Over the next several months, Mr. Kamel and Mr. Khabbas were interviewed by government officials and private individu-

als who were investigating the fire. In addition to Mr. Scaife's perjury before the grand jury, which was suborned by Mr. Kamel, both defendants themselves gave a number of inconsistent and untruthful answers to these investigators, which statements were offered as evidence at the trial. After the fire, the insurance company employed Patrick Walsh as an insurance adjustor in connection with the fire loss claim. In a taped statement given to Mr. Walsh on December 23, 1988, Mr. Kamel falsely stated that it was his intention that the store would remain at the West 81st Street location. On January 3, 1989, Mr. Kamel was interviewed by Tamra Bilik, a Special Agent for the Bureau of Alcohol, Tobacco and Firearms. At that time, Mr. Kamel falsely told Agent Bilik that Mr. Khabbas did not work at the store, and also told her that he had not signed a lease for a new store location. Finally, on May 3, 1989, Mr. Kamel met with Richard Heytow, an attorney retained by the insurance company to review Mr. Kamel's claim. At that time, Mr. Kamel gave a sworn statement to Mr. Heytow, falsely stating that he had signed the lease on the Vincennes Avenue location only after the fire occurred and that he had only talked with Mr. Scaife once from August 1988, until after the date of the fire.

Like his brother, Mr. Khabbas also made false statements to Agent Bilik. Particularly, in an interview given on January 4, 1989, he stated that he had left the store at about 9 p.m., and had not returned to West 81st Street until about 10:45 p.m. In fact, he had been interviewed there by Police Officer Hafford, and had been seen there by Mr. Pitts, right after the start of the fire at 10 p.m.

### D.

On January 30, 1990, a grand jury returned a five count indictment, charging Mr. Kamel and Mr. Khabbas with two counts of wire fraud, in violation of 18 U.S.C. § 1343; two counts of mail fraud, in violation of 18 U.S.C. § 1341; and one count of damage to property used in interstate commerce or in an activity affecting interstate commerce, by means of fire or an explosive, in violation of 18 U.S.C. § 844(i). On March 28, 1990, the grand jury returned a superseding, six count indictment, adding a charge of using fire or explosives to commit a felony, in violation of 18 U.S.C. § 844(h), to the original five counts.

The jury trial began on October 1, 1990. At the conclusion of the government's case, the defendants moved for a judgment of acquittal; the court denied this motion. On October 10, 1990, the jury returned a verdict of guilty on all six counts against Mr. Kamel. The jury acquitted Mr. Khabbas of Counts One through Four and Count Six, but it convicted him of Count Five, which was the arson charge under Section 844(i). Sentences were imposed on both defendants on March 5, 1991. Mr. Kamel received a sentence of 51 months imprisonment on Counts One through Five, to be served concurrently, and a sentence of five years imprisonment on Count Six, to be served consecutively with the term of imprisonment on the first five counts. Mr. Khabbas received a sentence of 46 months imprisonment on Count Five.

### E.

Sentencing had originally been set for January 17, 1991. On that date, counsel for Mr. Kamel[1] stated that he wished a continuance to explore the possible existence of "newly discovered evidence." On February 15, Mr. Kamel filed a motion, pursuant to Rule 33 of the Federal Rules of Criminal Procedure, for a new trial on that ground. In support of that motion, Mr. Kamel asserted that, sometime after the trial, he had learned that Mr. Khabbas and a third party, Fehmi Samad,[2] had admitted

---

1. Mr. Paul Wagner was Mr. Kamel's trial attorney. After the trial concluded, in November of 1990, Mr. Kenneth Cunniff replaced Mr. Wagner.

2. Mr. Samad was the previous owner of the liquor store; some time in 1988, prior to the fire, he had married Mr. Kamel's sister. He apparently would be entitled to some of the proceeds of the insurance policy, to satisfy a lien he obtained on the property as part of the sale of the store to Mr. Kamel.

their responsibility for the fire and had exonerated Mr. Kamel. The district court held a hearing on Mr. Kamel's motion on February 28, 1991, and then denied it. These appeals followed.

## II

## ANALYSIS

On appeal, both defendants argue that there is insufficient evidence to sustain the convictions. In addition, Mr. Kamel, but not Mr. Khabbas, raises two grounds for a new trial in the event that the convictions are not set aside. First, Mr. Kamel asserts that the district court erred in not granting a new trial on the basis of newly discovered evidence. Second, Mr. Kamel asserts that he was denied adequate representation of counsel at his trial.

### A. *Sufficiency of the Evidence*

██ The defendants' principal assertion is that the evidence presented by the government was purely circumstantial, and that it was insufficient to allow a jury to conclude, beyond a reasonable doubt, that they were responsible for the crimes of which they were convicted.[3] The defendants concede that the fire was deliberately set. They assert, however, that it was started by other, unknown individuals. At the trial, the defendants offered evidence about the deteriorated and vandalized condition of the building and the ease with which other persons had access to it. Testimony was also offered that other, unrelated fires had occurred in the building both before and after December 19, 1988. At their trial, they also offered an alibi defense, in which two witnesses testified that both defendants were far removed from the store at the time the fire began. Furthermore, the defendants argue that the government proffered no testimonial evidence directly connecting the defendants to the fire, such as evidence locating the defendants at the scene of the fire at the very moment it occurred or indicating that they had purchased the inflammables used to start the fire. Nor did the government offer physical evidence, such as incendiary devices in the defendants' possession, clothes with traces of inflammables, or the like.

The defendants recognize that the crime of arson, like most other crimes, may be proved by the use of circumstantial evidence.[4] They argue, however, that there was "not enough" evidence in this case to uphold their convictions. In support of this argument, they point to two decisions by this court—*United States v. Arvanitis*, 902 F.2d 489 (7th Cir.1990), and *United States v. Lundy*, 809 F.2d 392 (7th Cir.1987)—in which this court affirmed convictions. They then suggest that there was far more evidence of arson in those cases than in this case, and that those cases establish some sort of baseline of sufficient evidence.[5] However, different kinds and

**3.** Mr. Kamel's motion for a new trial was predicated in part on an apparent confession by his brother. There is no statement in the record directly from Mr. Khabbas containing his confession. The assertions that Mr. Khabbas has accepted responsibility for the fire instead are found in affidavits by Mr. Kamel and by Balquis Khabbas, Mr. Khabbas' wife, which were furnished in support of Mr. Kamel's post-trial motion for a new trial. At oral argument, Mr. Khabbas' counsel contended that, even if his client is now prepared to confess his role in setting the fire, that admission cannot be used for purposes of testing the sufficiency of the evidence which was the basis of his client's conviction. Without deciding that issue definitively, we shall look solely at the trial record to determine whether to set aside the conviction.

**4.** *United States v. Jackson*, 935 F.2d 832, 843 (7th Cir.1991) ("In meeting its burden of proof, the government may use circumstantial evidence, and, in fact, such evidence 'may be the sole support for a conviction.'") (quoting *United States v. Durrive*, 902 F.2d 1221, 1225 (7th Cir. 1990) (quoting *United States v. Nesbitt*, 852 F.2d 1502, 1511 (7th Cir.1988), *cert. denied*, 488 U.S. 1015, 109 S.Ct. 808, 102 L.Ed.2d 798 (1989))).

**5.** In fact, *Arvanitis*, which involved a RICO conviction for which arson was one of the predicate offenses, said nothing at all about the sufficiency of the evidence necessary to convict, since there the three defendants all had entered pleas of guilty. In *Lundy*, arguments similar to those proffered by the defendants here were also rejected. This court noted that "[t]he government presented no direct evidence that Lundy set fire to Yale Mart. But ... there was substantial circumstantial evidence permitting the jury to find Lundy guilty beyond a reasonable doubt." *Lundy*, 809 F.2d at 396. Virtually identical lan-

amounts of proof could be identified in every different case. We conclude that here the evidence the government offered was clearly sufficient to support both Mr. Kamel's and Mr. Khabbas' conviction. If the classic characteristics of a crime are "motive" and "opportunity," both were present in ample amounts.

As far as motive is concerned, the evidence indicated that the business was marginally profitable at best. In spite of this difficulty, Mr. Kamel initially obtained insurance on the premises in excess of the value of the contents; he increased that insurance coverage once, and then took some preliminary steps to increase it yet a second time. In the months before the fire occurred, both defendants acted to find alternate premises for their store, and then shortly before the fire, both defendants removed inventory from the store. These facts certainly support the conclusion that the defendants intended to set a fire and to claim more serious damage than in fact occurred, to reap financial benefits from insurance coverage.

Several witnesses placed Mr. Khabbas in and near the store shortly before the time that the fire began.[6] The government did not need to offer a photograph of Mr. Khabbas, match in one hand and gasoline can in the other, standing at the door of the store, in order to prove that he indeed was the person who started the fire. Although Mr. Kamel was not physically present at the store at the crucial moment that the fire started, the evidence certainly justified the conclusion that he knew of his brother's intent to ignite the fire and, more importantly, that he was an active participant in the plan. The evidence indicated that Mr. Kamel was responsible for increasing the amount of insurance coverage; he participated in removing inventory from the store; he made arrangements for obtaining new premises for the business; and he dealt with the representatives of the insurance carrier to process the claim for the proceeds.

The defendants sought to offer an alternative explanation for their conduct. The defendants' attempt to undermine the government's witnesses, and to offer their own version of the events in question, is seriously undercut by the evidence of the many inconsistent and untruthful statements that they gave to Police Officer Hafford, to Special Agent Bilik, to Mr. Heytow and to Mr. Disalvo, and by Mr. Kamel's efforts to suborn perjury by Mr. Scaife before the grand jury.

At trial, the defendants mounted an alibi defense. They chose not to testify in their own behalf. Instead, the defendants offered eight witnesses to respond to the government's case, including two who testified about Mr. Kamel's and Mr. Khabbas' whereabouts on the night of December 19. However, in addition to its affirmative proof, the government offered substantial evidence to contradict this defense. Although the jury might have chosen to believe the defendants' witnesses, it was certainly within its province to weigh that testimony against the bulk of evidence connecting the defendants with the fire and to disbelieve the alibis that were offered.

In weighing a challenge on appeal to the sufficiency of the evidence used by a jury to convict a defendant, this court applies a highly deferential standard. We have recently restated the standard we apply in reviewing challenges to the sufficiency of the evidence supporting jury verdicts:

> A defendant challenging the sufficiency of the evidence supporting his conviction faces a "formidable" burden as we must affirm as long as "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." In making this determination we look to all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the government. We must affirm unless the record is barren of any evidence, regardless of weight, from which the trier of

---

guage could be used to describe the situation of Mr. Kamel and Mr. Khabbas.

**6.** Mr. Pitts also testified that Mr. Khabbas' automobile was located outside the store shortly before the fire occurred.

fact could find guilt beyond a reasonable doubt.

*United States v. Jackson*, 935 F.2d 832, 840, 843 (7th Cir.1991) (quoting *United States v. Atterson*, 926 F.2d 649, 655 (7th Cir.) (citations omitted), *cert. denied,* —— U.S. ——, 111 S.Ct. 2909, 115 L.Ed.2d 1072 (1991)).

In order for us to affirm, it is not necessary to determine that we too would have reached the same conclusions based on the evidence before us as did the jury. It was the jury's role to evaluate the testimony of all the witnesses and to weigh all the evidence before it. We conclude that there was far more than enough evidence to justify the jury's determination of guilt beyond a reasonable doubt.

## B. *Newly Discovered Evidence*

■ Rule 33 of the Federal Rules of Criminal Procedure provides that "[t]he court on motion of a defendant may grant a new trial to that defendant if required in the interests of justice." Probably the most frequent basis for that motion—and the only one specifically mentioned in the rule—is one "based on the ground of newly discovered evidence." Mr. Kamel asserts that, after the trial was over, he learned, through his brother's confession, that Mr. Khabbas and Mr. Samad accepted full responsibility for the fire and were prepared to exonerate him. He argues that this evidence should form the basis for setting aside his conviction and affording him a new trial.

Because of the importance accorded to considerations of repose, regularity of deci-sion-making and conservation of scarce judicial resources, courts exercise "great caution" in setting aside a verdict reached after fully-conducted proceedings;[7] this is particularly appropriate when, as here, the action has been tried before a jury.[8] Furthermore, because of the greater familiarity that the trial court has with the conduct of the proceedings, appellate courts are additionally wary of second-guessing the judge and jury. In a long line of cases, this court has made clear that a defendant relying on this ground must make a multi-stage showing to justify the grant of the motion:

> The defendant must demonstrate that the evidence (1) came to their [sic] knowledge only after trial; (2) could not have been discovered sooner had due diligence been exercised; (3) is material and not merely impeaching or cumulative; and (4) would probably lead to an acquittal in the event of a retrial.

*Jarrett v. United States*, 822 F.2d 1438, 1445 (7th Cir.1987).[9]

■ In addition to requiring this showing, this court has also held that the decision to grant or deny a new trial under Rule 33 is a matter of discretion for the trial court. That determination will be disturbed on appeal only if the district court abused its discretion. *See, e.g., United States v. Mazzanti*, 925 F.2d 1026, 1030 n. 5 (7th Cir.1991); *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir.1989); *Goodwin*, 770 F.2d at 639; *Nero*, 733 F.2d at 1202. In this case, we find that the requirements for granting a new trial were not satisfied. Therefore, we conclude that the district

---

**7.** "[S]uch motions 'are not favored by the courts and are viewed with great caution.'" *United States v. Oliver*, 683 F.2d 224, 228 (7th Cir.1982) (quoting *United States v. Curran*, 465 F.2d 260, 262 (7th Cir.1972)); *see also United States v. Pena*, 949 F.2d 751, 758 (5th Cir.1991); *United States v. Fowler*, 735 F.2d 823, 830 (5th Cir.1984).

**8.** *See United States v. Stofsky*, 527 F.2d 237, 243 (2d Cir.1975) ("it must be recognized that in the interest of according finality to a jury's verdict, a motion for a new trial based upon previously-undiscovered evidence is ordinarily 'not favored and should be granted only with great cau-

tion.'") (quoting *United States v. Costello*, 255 F.2d 876, 879 (2d Cir.), *cert. denied,* 357 U.S. 937, 78 S.Ct. 1385, 2 L.Ed.2d 1551 (1958)), *cert. denied,* 429 U.S. 819, 97 S.Ct. 65, 50 L.Ed.2d 80 (1976).

**9.** *See also Shore v. Warden, Stateville Prison*, 942 F.2d 1117, 1124 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1973, 118 L.Ed.2d 573 (1992); *United States v. Van Daal Wyk*, 840 F.2d 494, 500 (7th Cir.1988); *United States v. Goodwin*, 770 F.2d 631, 639 (7th Cir.1985); *United States v. Nero*, 733 F.2d 1197, 1202 (7th Cir.1984); *United States v. Oliver*, 683 F.2d 224, 228 (7th Cir.1982).

court clearly did not abuse its discretion in denying Mr. Kamel's motion.

As a preliminary matter, the nature of the actual "evidence" that supposedly would be proffered by Mr. Kamel if his motion were granted is unclear. This itself could prove a fatal obstacle for Mr. Kamel's motion, since the fourth requirement identified in *Jarrett*—the likelihood of acquittal based on the new evidence—"presupposes, of course, that the proffered new 'evidence' would be admissible at the new trial." *United States v. Parker,* 903 F.2d 91, 102–03 (2d Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 196, 112 L.Ed.2d 158 (1990).[10] There is no affidavit in the record from Mr. Khabbas of his confession, nor even a suggestion that he intends to testify.[11] For understandable reasons, the other alleged participant in the burning down of the store—Mr. Samad—has not come forward, and it is unlikely that he will do so. Therefore, the government argues, there is no admissible "new evidence" for the court to consider.

Prior to the hearing held on February 28, 1991,[12] the only document offered to the district court in support of Mr. Kamel's motion for a new trial was a statement signed only by his counsel, Mr. Kenneth Cunniff, which described two conversations—one between Mr. Khabbas' wife, Balquis Khabbas, and Mr. Samad, and the other between Mr. and Mrs. Khabbas. In these two conversations, Mr. Samad and Mr. Khabbas allegedly admitted their involvement in the crime to Mrs. Khabbas.

As a step in this extended hearsay, Mrs. Khabbas then allegedly relayed the subject of these conversations to Mr. Kamel. Subsequently, Mr. Kamel filed his own affidavit, reciting some of the details of what Balquis Khabbas told him. Mrs. Khabbas also furnished a brief affidavit, simply concurring in the substance of Mr. Kamel's affidavit.

Even if Mr. Kamel were granted a new trial, it is doubtful that these statements would be admissible in evidence to support Mr. Khabbas' and Mr. Samad's alleged confessions and their supposed exoneration of Mr. Kamel.[13] However, here it is unnecessary to resolve this issue, since we conclude in any event that the district court acted properly in denying the motion for a new trial. At best, Mr. Kamel can meet only the third of the four criteria set forth in *Jarrett.* We now turn to these four requirements for a new trial.

### 1. Evidence must be discovered only after trial

Mr. Kamel asserts that he did not learn of his brother's complicity in the fire until after the trial was over.[14] Although the record cannot (and we believe need not) confirm that he was absolutely "certain" of what Mr. Khabbas had done even before the trial started, there is very strong evidence which allowed the district court to conclude that, by the date of the trial, Mr. Kamel had actual knowledge of his broth-

**10.** *See also United States v. MacDonald,* 779 F.2d 962, 964 (4th Cir.1985); *United States v. Mackin,* 561 F.2d 958, 962–63 (D.C.Cir.), *cert. denied,* 434 U.S. 959, 98 S.Ct. 490, 54 L.Ed.2d 319 (1977).

**11.** Mr. Khabbas' reluctance to testify, or even to furnish an affidavit, is understandable, since he offered two witnesses in his behalf at trial, who testified that he was at home at the time the fire began. Such a statement would confirm the suspicion that he, as well as his brother, were responsible for subornation of perjury.

**12.** We note that the trial judge is not required to conduct a hearing to rule on a motion for a new trial, and may decide the motion based only on the affidavits and other supporting documents. "It is within the sound discretion of the district court to decide whether or not a hearing is

necessary to a determination on a request for a new trial." *United States v. Hedman,* 655 F.2d 813, 814 (7th Cir.1981). *See also United States v. Mazzanti,* 925 F.2d 1026, 1031 (7th Cir.1991); *United States v. Taglia,* 922 F.2d 413, 419 (7th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 2040, 114 L.Ed.2d 125 (1991).

**13.** *See United States v. Menard,* 939 F.2d 599, 600 (8th Cir.1991).

**14.** In his brief, Mr. Kamel asserts that "the fact that Khabbas had committed the arson ... was not known to the Defendant Kamel before trial. While the Government made much in their response to Kamel's motion of Kamel's 'suspicion' of his brother, even the Government must concede that Kamel did not actually possess evidence of his brother's complicity." Appellants' Br. at 26.

er's responsibility for starting the fire at the store.[15]

In connection with his motion for a new trial, Mr. Kamel signed a waiver of his attorney-client privilege on January 24, 1990, allowing his trial counsel, Paul Wagner, to discuss with representatives of the government his pre-trial conversations with Mr. Kamel. Mr. Wagner then furnished an affidavit to the court, describing his discussions with Mr. Kamel. Mr. Wagner related that on September 30, 1990—the day before the beginning of the trial—Mr. Kamel revealed the truth of Mr. Khabbas' responsibility for setting the fire.[16] Mr. Wagner further related that he then asked Mr. Kamel directly which version of the facts was true—the earlier one, or the new one implicating his brother. Mr. Wagner stated that "Kamel eventually backed off this new version of events, and he did not mention it to me again." [17]

Further evidence of Mr. Kamel's knowledge of Mr. Khabbas' responsibility is found in an affidavit given by Special Agent Bilik. Describing an interview she had with Mr. Kamel on January 24, 1991, she related that when he arrived at the scene of the fire, Mr. Kamel saw his broth-er already there and was told by him, in Arabic, to state to the police officer that Mr. Khabbas had been at home at the time the fire broke out. Although he knew that statement was false, Mr. Kamel then told this lie to the police.[18] Despite these facts, Mr. Kamel would ask us to believe not only that he did not know back in December of 1988 of his brother's plan to burn down the store, but also that after being asked to cover up for his brother to the police, he did not ask Mr. Khabbas any further questions in the nearly two years between the date of the fire and the start of the trial.

Mr. Kamel's assertions that he merely had "suspicions" of his brother's responsibility for the fire, and that his actual knowledge of that fact is "newly discovered," is contradicted by the evidence in the record. Therefore, we conclude that Mr. Kamel fails the first requirement for a new trial.

## 2. Evidence could have been discovered with due diligence

In order to satisfy the second prong of the test for the grant of a motion for a new trial, Mr. Kamel would have to show that

---

**15.** In fact, for the purposes of ruling on the present motion, it would not be necessary to show that Mr. Kamel had actual knowledge of his brother's responsibility for the fire. It is sufficient that there was evidence which indicated that, if his trial strategy had been to pin full blame on his brother (instead of the alibi defense they jointly adopted), he reasonably should have known enough to have sought to obtain additional information, which would have proven his brother's responsibility for the crime.

> "[N]ewly discovered evidence" has a well-settled meaning; it is evidence which could not reasonably have been presented by the petitioner in the earlier proceeding.... By definition such evidence existed at an earlier time; thus, one must inquire "whether the petitioner *reasonably* either did not know about it or could not have presented it at an earlier proceeding."

*United States ex rel. Shore v. O'Leary,* 833 F.2d 663, 669 (7th Cir.1987) (emphasis in original) (quoting *Townsend v. Sain,* 372 U.S. 293, 317, 83 S.Ct. 745, 759, 9 L.Ed.2d 770 (1963)).

**16.** [I] went to Mr. Kamel's new store location for the purpose of interviewing prospective defense witnesses. On that date, contrary to his earlier representations to me, Kamel Ka-mel told me that he knew that Musa Khabbas had been involved in setting the fire at Shaban Food & Liquor. Kamel also changed his story at that time about Khabbas having been home at the time of the fire, but I do not recall whether Kamel told me that Khabbas had not been home at all or whether he said that Khabbas had come home at some point during the evening and left. However, according to Kamel's September 30 version, Musa Khabbas was not at home with him at the time the fire started....

Paul Wagner Affidavit, February 7, 1991, ¶ 4.

**17.** *Id.,* ¶ 7.

> At this stage, it appears that Mr. Khabbas has agreed to accept responsibility for the crime, in an attempt to exculpate his brother. This may reflect the fact that Mr. Kamel has received a far more substantial sentence than Mr. Khabbas. Mr. Wagner's affidavit indicates that acceptance of responsibility by only one brother was already a strategy being contemplated before the trial. "Although prior to September 30, Kamel told me it would be better if he were the one convicted, on September 30 he seemed to have changed his mind." *Id.,* ¶ 9.

**18.** Tamra Bilik Affidavit, Feb. 5, 1991, ¶ 7–8.

he could not have discovered the relevant evidence despite the exercise of "due diligence." *See generally United States v. Lockhart*, 956 F.2d 1418, 1426 (7th Cir. 1992). Here, however, even if we accept Mr. Kamel's assertion that he did not truly "know" of Mr. Khabbas' or Mr. Samad's responsibility for the fire, the facts indicate that Mr. Kamel did nothing to confirm his suspicions of the "true culprits" or to ascertain the truth of the situation.

Mr. Kamel knew that his brother was at the store shortly before the fire, and he knew that his brother had asked him to lie to the police about his whereabouts. Yet, Mr. Kamel would have us believe that he never sought to learn if his brother had started the fire.[19] Mr. Kamel also knew that Mr. Samad would receive insurance benefits from a fire at the store, and therefore had a motive for arson. Yet, Mr. Kamel apparently never sought to investigate this possibility, until, on the very morning of the first day of the trial, he suggested to his attorney, Mr. Wagner, that he wanted Mr. Samad as a witness and that, because Mr. Samad was out of the country, they should seek a continuance in the trial.[20]

If there is possible evidence which would exonerate a defendant, he may not simply ignore it, awaiting the outcome of the trial and having the opportunity of using that evidence later for a second chance for acquittal. *See United States v. Streich*, 759 F.2d 579, 587 (7th Cir.), *cert. denied*, 474 U.S. 860, 106 S.Ct. 172, 88 L.Ed.2d 142 (1985); *see also United States v. Boschetti*, 794 F.2d 416, 419–20 (8th Cir.), *cert. denied*, 479 U.S. 889, 107 S.Ct. 289, 93 L.Ed.2d 263 (1986). Mr. Kamel undertook little or no effort, prior to his trial, to obtain the evidence that he now seeks to offer in his defense. In the absence of such steps, we conclude that Mr. Kamel has not shown the requisite "due diligence" to justify the granting of his motion for a new trial.[21]

### 3. Evidence must be material

A new trial will not be granted if the evidence offered is merely impeaching or cumulative; it must be material.[22] Even the statement by Mr. Khabbas that he actually set the fire would not overcome the substantial evidence of Mr. Kamel's involvement in the arson and insurance fraud

---

**19.** Agent Bilik's affidavit reveals other facts which Mr. Kamel knew prior to trial that might have revealed his brother's responsibility for the fire and which Mr. Kamel failed adequately to investigate. Telephone company records showed that a number of phone calls were made from Mr. Kamel's and Mr. Khabbas' home to the store, after Mr. Khabbas supposedly closed the store for the night. At the trial, Mr. Khabbas sought to explain these calls by having someone (Abraham Shaban) testify falsely that there was an answering machine at the store. Mr. Kamel admitted to Agent Bilik that he knew of this intended perjury. *See* Bilik Affidavit, ¶ 9.

Mr. Kamel's response to this information, which would have incriminated his brother and might have helped to exonerate him, was half-hearted at best. In an interview with Agent Bilik on January 29, 1991, Mr. Khabbas stated that "after Kamel learned that the phone records from their home revealed four telephone calls to the liquor store after Khabbas supposedly closed the store and left on the night of the fire, Kamel asked Khabbas how those calls could have been made. Khabbas claimed that he refused to answer the question." Bilik Affidavit, ¶ 15. Even if the amount of information that Mr. Kamel possessed did not confirm his suspicions, he can hardly be said to have exercised "due diligence" to ascertain the truth of the matter prior to the trial, by seeking to obtain additional information.

**20.** Wagner Affidavit, ¶ 8.

**21.** As this court has noted, "a defendant's 'claim of diligence is seriously undermined by the failure of the defense to have a subpoena issued for the witness or to request a continuance on the basis of [the witness'] unavailability.'" *United States v. Oliver*, 683 F.2d 224, 228 (7th Cir.1982) (quoting *United States v. Bryson*, 434 F.Supp. 986, 987 (W.D.Okla.1977)). The fact that Mr. Kamel mentioned a continuance to his attorney on the first day of the trial, who then properly advised him that the court was quite unlikely to grant that request at such a late date, does not alter this analysis. *See also United States v. Kulczyk*, 931 F.2d 542, 548–49 (9th Cir.1991).

**22.** *See United States v. Natanel*, 938 F.2d 302, 314 (1st Cir.1991) (affidavit undermining portion of witness' testimony merely impeached his credibility, and was not "material"), *cert. denied*, —— U.S. ——, 112 S.Ct. 986, 117 L.Ed.2d 148 (1992); *United States v. Provost*, 921 F.2d 163, 164–65 (8th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1603, 113 L.Ed.2d 666 (1991).

for which he was convicted—including changing the amount of insurance coverage, emptying the store of its inventory, and making arrangements for a lease on another store location, and then covering up all these facts as well as the many facts pointing to his brother's responsibility for the fire. However, we recognize that Mr. Khabbas' and Mr. Samad's version of the facts—and particularly a statement expressly exonerating Mr. Kamel—would be relevant and material, rather than merely peripheral to an understanding of the crime.[23] Mr. Khabbas' confession, coupled with the purported statement of his brother's ignorance of the starting of the blaze, *might* have diminished Mr. Kamel's culpability in the eyes of the jury—*if it were believed*, a matter to which we turn next.

4. There must be a probability of acquittal

A new trial will be granted only if the newly discovered evidence would probably lead to an acquittal in the event of a retrial. *United States v. Taglia*, 922 F.2d at 415–16; *United States v. Leibowitz*, 919 F.2d 482 (7th Cir.1990), *cert. denied*, — U.S. ——, 111 S.Ct. 1428, 113 L.Ed.2d 480 (1991). Here, however, it is highly improbable that, in the face of the substantial evidence of Mr. Kamel's guilt, the purported confessions would be believed by a second jury.

The communications that both of the defendants have had with government officials and private investigators since the date of the fire have been riddled with outright lies.[24] Mr. Kamel suborned perjury by Mr. Scaife before the grand jury. At the trial, Mr. Khabbas offered two alibi witnesses who testified that he was at his home when the fire started, although he apparently has now admitted that he was at the store, setting the fire, at that time. Naturally, much, if not all, of this evidence would be brought out if there were a second trial. At that second trial, Mr. Kamel would be relying for his exoneration on the hearsay report of a confession of a close relative who now stands as a convicted felon.

Both the timing and the nature of the alleged confessions—particularly that of Mr. Khabbas—make them of diminished reliability. Confessions given only after the confessor's conviction, and especially when proffered by relatives or friends, are engulfed in an "aura of suspicion and doubt." *United States v. Oliver*, 683 F.2d 224, 229 (7th Cir.1982).[25] They are of limited probative value at a second trial, and hence are unlikely to lead to an acquittal. *See United States v. Metz*, 652 F.2d 478, 480–81 (5th Cir., Unit A 1981). "[A]ttempts by one defendant to take full responsibility after trial and conviction are common and are viewed with skepticism." *United States v. Benavente Gomez*, 921 F.2d 378, 383 (1st Cir.1990); *see also Pelegrina v. United States*, 601 F.2d 18, 21 (1st Cir.1979).

Mr. Khabbas repeatedly and firmly denied any involvement in the crime for a period of three years. Mr. Khabbas' purported confession, coming after his conviction and shortly before sentencing, when he has relatively little to lose by accepting full responsibility for the fire, is far less credible.[26] It is likely that the jury would see the offer of the confession as nothing more than brotherly loyalty, with Mr. Khabbas taking full blame for a crime for which he, as well as his brother, has al-

---

**23.** *Cf. United States v. Kelley*, 929 F.2d 582, 586 (10th Cir.) (affidavit that witness testified falsely before grand jury, and that her husband and two other government witnesses testified falsely at trial, was merely impeaching), *cert. denied*, — U.S. ——, 112 S.Ct. 341, 116 L.Ed.2d 280 (1991).

**24.** *See* notes 16–18 above and accompanying text.

**25.** "Recanting affidavits and witnesses are viewed with extreme suspicion." *United States*

*v. Chambers*, 944 F.2d 1253, 1264 (6th Cir.1991), *cert. denied*, — U.S. ——, 112 S.Ct. 1217, 117 L.Ed.2d 455 (1992).

**26.** In fact, the Ninth Circuit has held as a matter of law that "[w]hen a defendant who has chosen not to testify subsequently comes forward to offer testimony exculpating a co-defendant, the evidence is not 'newly discovered.'" *United States v. Diggs*, 649 F.2d 731, 740 (9th Cir.), *cert. denied*, 454 U.S. 970, 102 S.Ct. 516, 70 L.Ed.2d 387 (1981); *see also United States v. Lockett*, 919 F.2d 585, 591 (9th Cir.1990).

ready been convicted.[27] In light of Mr. Khabbas' willingness to lie since 1988, one more lie—to try to get his brother off the hook—apparently would not make much difference to him. It boggles the mind to think that a second jury would be any less likely to convict Mr. Kamel of these crimes than was the first. Mr. Kamel's motion soundly fails the fourth requirement of Rule 33.

In sum, there are four requirements for the grant of a motion for a new trial, and the party seeking that new trial must satisfy all four. The grant of a new trial falls within the discretion of the trial court, and will be reversed on appeal only in very unusual circumstances. Here, Mr. Kamel has failed to satisfy at least three of the requirements. It is clear that the district court did not abuse its discretion in denying Mr. Kamel's motion.

## C. *Ineffective Assistance of Counsel*

▮ Mr. Kamel asserts that, at his trial, he was deprived of his constitutional right to the effective assistance of counsel.[28] The necessary elements for a showing of that deprivation were identified by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction ... has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction ... resulted from a breakdown in

**27.** The purported confession by Mr. Kamel's brother-in-law, Mr. Samad, if it were ever really offered, would fall prey to the same objection. Furthermore, as noted earlier, there is no indication that Mr. Samad has any intention of confessing to his alleged role in the fire. *See United States v. Oliver,* 683 F.2d 224, 229 (7th Cir.1982).

**28.** Preliminarily, we note that Mr. Kamel first raised objections to his trial counsel's conduct of his defense only at the sentencing hearing, held on March 5, 1991. Although he made a motion for a new trial on February 15, 1991, this was limited to the grounds of newly discovered evidence. A number of courts of appeals have held that absent special circumstances, claims of ineffective assistance of counsel may not be raised in the first instance on appeal. *See, e.g., United States v. DeFusco,* 930 F.2d 413, 415 (5th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 239, 116 L.Ed.2d 194 (1991); *United States v. Morales-Diaz,* 925 F.2d 535, 539 (1st Cir. 1991); *United States v. Martin,* 920 F.2d 345, 349 (6th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2038, 114 L.Ed.2d 122 (1991).

However, this circuit has allowed appellate consideration of
> contentions [which] are all matters of record ... even though they have not been presented to the District Court. *Cf. United States v. Taglia,* 922 F.2d 413, 418 (7th Cir. 1991) (distinguishing ineffectiveness claims that rely only on the trial record, which must be raised on direct appeal, and claims that rely on outside evidence, which may be raised in collateral proceedings under 28 U.S.C. § 2255) [, *cert. denied,* —— U.S. ——, 111 S.Ct. 2040, 114 L.Ed.2d 125 (1991) ].

*United States v. Hubbard,* 929 F.2d 307, 311 (7th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 206, 116 L.Ed.2d 165 (1991).

*See also United States v. Ayala-Rivera,* 954 F.2d 1275, 1279 (7th Cir.1991) (recognizing exception to general rule "if the issue of competence is clear-cut and it can be conclusively determined from the trial record"); *United States v. Limehouse,* 950 F.2d 501, 503 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1962, 118 L.Ed.2d 563 (1992); *United States v. Reiswitz,* 941 F.2d 488, 495 (7th Cir.1991); *United States v. Rodriguez-Luna,* 937 F.2d 1208, 1214-15 (7th Cir.1991); *United States v. Williams,* 934 F.2d 847, 851 (7th Cir.1991). *Cf. United States v. Ashimi,* 932 F.2d 643, 648 (7th Cir.1991) (since court of appeals does not hear evidence, and only source of information is trial record, defendant raising claim on direct appeal "faces even more of an uphill fight").

Here, while we conclude that Mr. Kamel's claim of ineffective assistance of counsel is without merit, we also find that the nature of his objections to Mr. Wagner's conduct is sufficiently narrow that we may consider them based solely on the record. This is in part because the record contains an affidavit from Mr. Wagner, as well as comments on his performance by the trial judge. *See infra* note 36.

the adversary process that renders the result unreliable.[29]

For understandable reasons, "[t]he defendant bears a heavy burden in establishing an ineffective assistance of counsel claim." *United States v. Moya–Gomez*, 860 F.2d 706, 763 (7th Cir.1988), *cert. denied*, 492 U.S. 908, 109 S.Ct. 3221, 106 L.Ed.2d 571 (1989). Indeed, we have described it as a "high mountain a defendant must climb to demonstrate ineffective assistance of counsel." *United States v. Balzano*, 916 F.2d 1273, 1292 (7th Cir. 1990). Although we are cognizant of the importance of protecting this constitutional right, we also recognize that otherwise "[c]riminal trials resolved unfavorably to the defendant would increasingly come to be followed by a second trial, this one on counsel's unsuccessful defense," *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066, and that many of these claims " 'accomplish little other than the waste of judicial resources, and possibly reflect unfairly on trial counsel.' " *Balzano*, 916 F.2d at 1297 (quoting *United States v. Olson*, 846 F.2d 1103, 1111 (7th Cir.1988)).[30] Because of these concerns, the Supreme Court has cautioned that, "[t]o counteract the natural tendency to fault an unsuccessful defense, a court reviewing a claim of ineffective

assistance must 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " *Nix v. Whiteside*, 475 U.S. 157, 165, 106 S.Ct. 988, 993, 89 L.Ed.2d 123 (1986).[31]

This court has imposed a requirement that, as an initial matter, "the defendant must identify the specific acts or omissions of counsel that formed the basis for his claim of ineffective counsel." *Moya–Gomez*, 860 F.2d at 763–64; *see also United States v. Jackson*, 935 F.2d 832, 845 (7th Cir.1991). Here, it is not clear precisely what Mr. Kamel contends that Mr. Wagner did or did not do. In his brief in this court, Mr. Kamel's contention is limited to the following statement: "Kamel specifically advised his attorney prior to trial [32] that he had information that would show that Khabbas and Samad were responsible for the fire.... Wagner did not ask for a new trial [33] or attempt to interview Samad about the connection between Khabbas and Samad." Appellants' Br. at 28.

Treating this assertion as the entirety of Mr. Kamel's objections to Mr. Wagner's performance,[34] we conclude that these alleged omissions completely fail to satisfy the two requirements in *Strickland* for

**29.** *See also MacDougall v. McCaughtry*, 951 F.2d 822, 825 (7th Cir.1992); *Bae v. Peters*, 950 F.2d 469, 475 (7th Cir.1991); *United States v. Delgado*, 936 F.2d 303, 310 (7th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 972, 117 L.Ed.2d 137 (1992).

**30.** We recently referred to "the inevitable ineffective assistance of counsel claim." *United States v. Reiswitz*, 941 F.2d 488, 495 (7th Cir. 1991).

**31.** "The court's scrutiny of counsel's performance must be conducted with a high degree of deference and without the distorting effects of hindsight." *United States v. Moya–Gomez*, 860 F.2d 706, 764 (7th Cir.1988), *cert. denied*, 492 U.S. 908, 109 S.Ct. 3221, 106 L.Ed.2d 571 (1989); *see also United States v. Ashimi*, 932 F.2d 643, 648 (7th Cir.1991); *United States ex rel. Simmons v. Gramley*, 915 F.2d 1128, 1133 (7th Cir. 1990); *United States v. Adamo*, 882 F.2d 1218, 1229–30 (7th Cir.1989).

**32.** As indicated in Mr. Wagner's affidavit, *see supra* notes 16–17 & 20 and accompanying text, the information about Mr. Khabbas' involve-

ment was conveyed to Mr. Wagner by Mr. Kamel only on the day before trial. And Mr. Kamel's raising the possibility of a continuance, so that Mr. Samad could be present to testify at the trial, was only made on the very morning that the trial was to begin.

**33.** Since Mr. Wagner was replaced almost immediately after the trial, and since a motion for a new trial on the basis of newly discovered evidence was made shortly thereafter by Mr. Kamel's new counsel, it is not clear whether this objection is really to Mr. Wagner's alleged failure to ask for a continuance on the morning of trial, or whether this statement suggests some other unidentified deficiency.

**34.** At his sentencing hearing, Mr. Kamel objected that he did not take the stand in his own behalf because his attorney allegedly had led him to believe that the government's case-in-chief had failed to meet its burden of proof. Tr., Sent. Hearing at 38, 41. He apparently does not continue to complain of that recommendation on appeal.

showing ineffective assistance of counsel.[35] Therefore, we reject Mr. Kamel's request for a new trial on this ground.

### 1. Deficient performance

■ Under *Strickland,* Mr. Kamel must show that his counsel's performance was "deficient." Our review of the record, however, leads to precisely the opposite evaluation of Mr. Wagner's conduct of Mr. Kamel's defense. Any objections either to the nature or to the quality of the defense must be laid directly on the doorstep of the person responsible for those alleged deficiencies—the defendant himself.[36]

Up until the date of the motion for a new trial, Mr. Kamel consistently denied any involvement on his or Mr. Khabbas' part in starting the fire.[37] Mr. Kamel fully and knowingly participated in the decision to adopt a joint alibi strategy at trial, rather than seeking to shift the responsibility to his brother and his brother-in-law, Mr. Samad.[38] Both Mr. Kamel and Mr. Khabbas consistently maintained that the fire might have been caused by vandals or squatters living above the store, and this was the theme of their defense. Mr. Kamel gave the names of a number of alibi witnesses to Mr. Wagner; he interviewed them, and they were called to testify in Mr. Kamel's behalf. The defendants would have been acquitted if the jury had believed their version of the facts. But, having chosen this route and seen its failure, Mr. Kamel cannot now be heard to complain that somehow his lawyer was at fault for not pursuing another trial strategy.[39] Since there is no ineffective assistance of counsel even where the attorney chooses one reasonable strategy to the exclusion of another, *see United States v. Guerrero,* 938 F.2d 725, 730 (7th Cir.1991); *United States v. Adamo,* 882 F.2d 1218, 1227–28 (7th Cir.1989), Mr. Kamel's after-the-fact complaint about Mr. Wagner's representation is even less availing when it was the defendant who chose to rely on an alibi defense.

Another reason for rejecting Mr. Kamel's assertion that his trial counsel's performance was subpar is that he is obviously trying to have it both ways. In order to sustain his burden under Rule 33, which required him to show that his brother's confession was "newly discovered," Mr. Kamel asserted that he did *not* know of his brother's involvement in the fire prior to the trial, but merely had "suspicions." [40] Here, however, he not only asserts that he conveyed that information to his attorney, but that somehow Mr. Wagner was derelict

---

35. Although we consider the alleged deficiency of Mr. Wagner's performance first, and will also discuss the alleged prejudice to Mr. Kamel's defense briefly, *Strickland* reminds us that "there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697, 104 S.Ct. at 2069–70; *see also MacDougall v. McCaughtry,* 951 F.2d 822, 825 (7th Cir.1992).

36. Our conclusion that Mr. Wagner's performance in Mr. Kamel's behalf was far more than "adequate" is bolstered by the district court's statement at Mr. Kamel's sentencing hearing: "I ... have an abundance of faith that Mr. Wagner represented you as ably as he could.... [F]rom what I could see and tell, he did a good job for you. To basically now make him a scapegoat, at least from all that I know, is not fair to him." Tr., Sent. Hearing at 43, 46. Because the district court judge had the opportunity to observe Mr. Wagner's performance during the trial, his insights add to the conclusions this court can draw from the written record.

37. Indeed, until the day before trial, Mr. Kamel falsely maintained his brother's innocence even to Mr. Wagner. "Prior to September 30, 1990, Kamel consistently told me that Musa Khabbas had been at home when the call from Marshall Davis came to his home reporting the fire." Wagner Affidavit, ¶ 3.

38. Mr. Wagner stated that Mr. Kamel actively participated in the planning for the trial: "Kamel was exceptionally attentive to every nuance and development in the case. He advanced possible explanations for most of the evidence in the case, and we discussed these matters at great length." *Id.,* ¶ 11.

39. "Where a defendant, fully informed of the reasonable options before him, agrees to follow a particular strategy at trial, that strategy cannot later form the basis of a claim of ineffective assistance of counsel." *United States v. Weaver,* 882 F.2d 1128, 1140 (7th Cir.), *cert. denied,* 493 U.S. 968, 110 S.Ct. 415, 107 L.Ed.2d 380 (1989); *see also Rogers–Bey v. Lane,* 896 F.2d 279, 283 (7th Cir.), *cert. denied,* — U.S. ——, 111 S.Ct. 93, 112 L.Ed.2d 65 (1990).

40. *See supra* note 14.

in not pursuing or acting upon that possibility. If Mr. Kamel could not ascertain the truth from his own brother in the almost two years between the date of the fire and the trial, it defies comprehension to see what Mr. Wagner, a stranger, was supposed to have learned from Mr. Khabbas in the less than twenty-four hours between Mr. Kamel's disclosure and the start of the trial.

Mr. Kamel also asserts that Mr. Wagner's representation was deficient in his not attempting to interview Mr. Samad. There are two defects with this argument. First, on the day that the trial began, which was when Mr. Kamel first shared this information with his attorney, Mr. Samad was in Israel, more than 6000 miles from Chicago. Obviously the "interview" would have been impossible. Equally important, as noted above, even had Mr. Samad been present, it is unlikely that he would have been willing to incriminate himself by testifying in Mr. Kamel's behalf. To this date, Mr. Samad has still not come forward with anything to support Mr. Kamel's position.

■ Because of Mr. Samad's unavailability, Mr. Kamel implies that Mr. Wagner acted improperly in not asking for a continuance. This overlooks the fact that Mr. Kamel obviously had no absolute right to postpone the start of the trial. Indeed, under the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.*, the government, in advancing the public interest, has an equal right with a defendant to obtain the prompt disposition of a criminal prosecution.[41] The determination of whether to grant or deny a continuance is vested within the sound discretion of the trial court. *Morris v. Slappy*, 461 U.S. 1, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983);[42] *United States v. Rodgers*, 755 F.2d 533, 539–40 (7th Cir.), *cert. denied*, 473 U.S. 907, 105 S.Ct. 3532, 87 L.Ed.2d 656 (1985); *United States v. Black*, 684 F.2d 481, 485 (7th Cir.), *cert. denied*, 459 U.S. 1043, 103 S.Ct. 463, 74 L.Ed.2d 613 (1982); *United States v. Aviles*, 623 F.2d 1192, 1196 (7th Cir.1980).

Given the fact that the trial was about to start, and the government had all its witnesses present and ready, Mr. Wagner no doubt correctly assessed the situation in declining Mr. Kamel's suggestion and not futilely seeking a continuance.[43] "We also note that counsel does not render ineffective assistance by failing to pursue arguments that are clearly destined to prove unsuccessful ... or by strategically choos-

41. While the trial court could have exercised its discretion to grant a continuance under the circumstances here, the Speedy Trial Act suggests a predisposition against delays in starting the trial merely to allow the defense to obtain an additional witness: "No continuance ... shall be granted because of general congestion of the court's calendar, or lack of diligent preparation or failure to obtain available witnesses on the part of the attorney for the Government." 18 U.S.C. § 3161(h)(8)(C).

42. Trial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burden counsels against continuances except for compelling reasons. Consequently, broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary "insistence upon expeditiousness in the face of a justifiable "request for delay" violates the right to the assistance of counsel. *Morris*, 461 U.S. at 11–12, 103 S.Ct. at 1616.

43. This court has identified the factors that a court must weigh in considering a request for a continuance to allow a defendant time to produce alibi witnesses:

In the federal courts, the determination of whether the denial of a continuance based on the unavailability of witnesses amounts to an abuse of discretion requires the consideration of four factors: (1) whether due diligence has been exercised to obtain the attendance of the witnesses; (2) whether substantial favorable evidence would be tendered by the witnesses; (3) whether the witness is available and willing to testify; and (4) whether the denial of the continuance would materially prejudice the defendant. *United States ex rel. Searcy v. Greer*, 768 F.2d 906, 913 (7th Cir.), *cert. denied*, 474 U.S. 996, 106 S.Ct. 412, 88 L.Ed.2d 363 (1985).

There is no need to rehearse why these conditions would not have been met in this case. Suffice it to say that, in light of our observation in *Searcy* that "[s]everal federal cases have held on facts comparable to the present case that no abuse of discretion occurs when a defendant's motion for a continuance is not made until the trial has begun and after the defendant has known that the witness was needed for trial," *id.* at 914, Mr. Wagner's assessment that the trial court probably would not have granted a motion for a continuance was undoubtedly correct.

ing to pursue his client's strongest arguments and to forego marginal ones." *United States v. Lawson*, 947 F.2d 849, 853 (7th Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 1505, 117 L.Ed.2d 643 (1992). Therefore, we reject the assertion that Mr. Wagner's decision to proceed with the trial in Mr. Samad's absence rendered his performance "deficient."

### 2. Prejudice

■ As noted above, the second prong of the *Strickland* test is that "the defendant must show that the deficient performance prejudiced the defense." The Supreme Court held that this means that "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068; *see also Toro v. Fairman*, 940 F.2d 1065, 1068–69 (7th Cir.1991), *petition for cert. filed*, (U.S. February 17, 1992) (No. 91–7351).

In *United States ex rel. Cross v. DeRobertis*, 811 F.2d 1008, 1013 (7th Cir.1987), *cert. denied*, — U.S. —, 111 S.Ct. 122, 112 L.Ed.2d 91 (1990), we emphasized that these two "components of the *Strickland* analysis cannot be treated as hermetically sealed containers," and that an "inquiry with respect to one component will therefore often shed a valuable cross-light upon our inquiry with respect to the other." Because we conclude that Mr. Wagner's performance was not deficient, and because a successful showing of ineffective assist-ance of counsel requires satisfaction of *both* parts of the *Strickland* test, 466 U.S. at 687, 104 S.Ct. at 2064, there is no need to give detailed consideration to this second inquiry. However, our views of the high quality of Mr. Wagner's representation of Mr. Kamel[44] confirm that the defendant was not prejudiced by the defense chosen. Similarly, the nature of the government's case against Mr. Kamel suggests that the defense strategy chosen was a sound and reasonable professional decision.

As already noted, it would appear unlikely that Mr. Samad would have testified at all, so an interview with him, or a continuance to obtain his presence, would have been of little or no use. Furthermore, when the overwhelming amount of evidence pointing to Mr. Kamel's guilt is weighed against the value of Mr. Khabbas' alleged confession or evidence of his sole complicity, there is no reason to believe that the trial would have come out differently even if Mr. Wagner had taken the steps for which Mr. Kamel now argues.[45] In short, even if Mr. Wagner's performance was unprofessional—and we emphasize that it was not—we find that Mr. Kamel was simply not "prejudiced" by the legal representation he received. Thus, Mr. Kamel's claim of ineffective assistance of counsel fails the second part of the *Strickland* test as well.

### Conclusion

The evidence presented to the jury was more than sufficient to allow it to determine that Mr. Kamel and Mr. Khabbas were guilty, beyond a reasonable doubt, of

---

**44.** Although we share the district court's view, *see supra* note 34, that Mr. Wagner's representation of Mr. Kamel was more than adequate, we are also mindful that the Supreme Court in *Strickland* stressed that "[t]he object of an ineffectiveness claim is not to grade counsel's performance." 466 U.S. at 697, 104 S.Ct. at 2069.

**45.** In *United States ex rel. Cross v. DeRobertis*, 811 F.2d 1008, 1016 (7th Cir.1987), *cert. denied*, — U.S. —, 111 S.Ct. 122, 112 L.Ed.2d 91 (1990), we held that a defendant has a "burden of supplying sufficiently precise information," of the evidence that would have been obtained had his counsel undertaken the desired investigation, and of showing "whether such information, assuming its admissibility in court, would have produced a different result." *See also*

*United States ex rel. Simmons v. Gramley*, 915 F.2d 1128, 1133–34 (7th Cir.1990).

As discussed above in Part II.B. of this opinion, Mr. Kamel has not produced an affidavit, either from Mr. Samad or from Mr. Khabbas, indicating the evidence that would have been offered at the trial. This omission not only constitutes a failure to satisfy this requirement from *DeRobertis*, but also affords us no reason to believe that Mr. Wagner's alleged negligence in not obtaining this information affected the outcome of the trial. *See also Cross v. O'Leary*, 896 F.2d 1099, 1101 (7th Cir.) (requiring showing of "substantial likelihood that [proffered witnesses'] testimony, if presented at trial, would have led to a different result"), *cert. denied*, — U.S. —, 111 S.Ct. 122, 112 L.Ed.2d 91 (1990).

**500**

the crimes of which they stand convicted. We also conclude that the trial court acted properly in denying Mr. Kamel's motion for a new trial on the ground of newly discovered evidence. We furthermore conclude that Mr. Kamel has fallen far short of the showing required for a new trial on the ground of ineffective assistance of counsel. Therefore, the convictions of Kamel Kamel and Musa Khabbas are affirmed.

AFFIRMED.