**UNITED STATES of America,**
**Plaintiff–Appellee,**

**v.**

**Carl LEIBOWITZ, Defendant–Appellant.**

No. 87–2838.

United States Court of Appeals,
Seventh Circuit.

Argued June 7, 1988.

Decided Sept. 7, 1988.

Rehearing and Rehearing En Banc
Denied Nov. 15, 1988.

Kenneth E. Barden, Richmond, Ind., for defendant-appellant.

Thomas O. Plouff, Asst. U.S. Atty., James G. Richmond, U.S. Atty., South Bend, Ind., for plaintiff-appellee.

Before CUDAHY and EASTERBROOK, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

Defendant Carl Leibowitz ("defendant") was convicted after a jury trial of hiring a "hit man" to kill his business partner. Specifically, he was found guilty of conspiracy to use interstate commerce facilities in the commission of a murder-for-hire (18 U.S.C. § 371), use of interstate commerce facilities in the commission of murder-for-hire (18 U.S.C. § 1952A), obstruction of justice (18 U.S.C. § 1503), and witness tampering (18 U.S.C. § 1512). He appeals from his conviction on several grounds: 1) there was a fatal variance between the indictment, which charged him with use of the telephone to facilitate a murder-for-hire on or about October 12, 1986 and the government's evidence, which established that the call took place on September 21, 1986; 2) there is newly-discovered evidence which

would serve to impeach the testimony of the government's chief witness; 3) the verdict was not supported by substantial evidence; 4) the government improperly referred to the guilty plea of its chief witness in its final argument to the jury; and 5) defendant was denied effective assistance of counsel. For the reasons stated below, we affirm the judgment of the district court.

I

FACTUAL BACKGROUND

A. *The Murder-for-Hire Scheme*

Defendant is a lawyer (currently suspended from practice) and a promoter of tax shelters. In 1984, he became the subject of a two-year federal grand jury investigation into a tax shelter business known as "OPEC" in which he and his business partner, Gary Van Waeyenberghe ("Van Waeyenberghe"), leased non-existent ethanol equipment to investors. Van Waeyenberghe had already been indicted in connection with an unrelated tax shelter scheme and was a potential grand jury witness in the OPEC investigation.

During the summer of 1986, defendant contracted to have Van Waeyenberghe murdered by one Donald Wrobel, presumably to prevent Van Waeyenberghe from testifying against defendant in the OPEC investigation. The history of Wrobel's various attempts on Van Waeyenberghe's life reads like a macabre comedy of errors. According to the evidence adduced at trial, defendant first contacted Wrobel in or around July 1986 and hired him to murder Van Waeyenberghe. The precise terms of the contract are unclear. Defendant made an initial payment of $300 to Wrobel, but Wrobel told an employee that defendant had agreed to pay him an additional $3,000 upon completion of the murder. In August 1986 defendant promised to provide Wrobel with free legal services for the rest of his life as compensation for the contract murder of Van Waeyenberghe. On August 16, 1986, defendant sent a $300 Western Union money order to Wrobel to reimburse him for expenses in attempting to execute the murder. Thus defendant paid Wrobel a total of $600 to perform the contract.

During August 1986, defendant contacted Wrobel by telephone on several occasions, provided Wrobel with detailed information about Van Waeyenberghe's physical appearance, and again instructed him to kill Van Waeyenberghe. During one of those telephone conversations, defendant told Wrobel that he and Van Waeyenberghe were at a lawyer's office and asked Wrobel to "choke Van Waeyenberghe in the elevator." Wrobel declined to do so.

Notwithstanding that he had already contracted for Van Waeyenberghe's murder, defendant had several telephone conversations with Van Waeyenberghe in August and September 1986, in which he warned Van Waeyenberghe not to talk to the federal government or any other agency and that to do so could be "detrimental to Van Waeyenberghe's health."

During the month of September 1986 Wrobel made five abortive attempts to murder Van Waeyenberghe at various pay phones in Indiana where Van Waeyenberghe had been "set up" to receive a telephone call from defendant. The first unsuccessful attempt on Van Waeyenberghe's life occurred on September 4, 1986, in the Americana Hotel in South Bend, Indiana. Defendant had told Van Waeyenberghe that he would be calling him at a pay phone in the hotel, and instructed Wrobel to shoot Van Waeyenberghe at the phone. Wrobel arrived at the hotel with a snub-nose .357 magnum and went to a set of pay phones located upstairs. Van Waeyenberghe, however, had gone to a second set of pay phones downstairs. Defendant called the upstairs telephone. Wrobel answered and said that Van Waeyenberghe had not shown up.

The next three unsuccessful attempts on Van Waeyenberghe's life occurred at a pay phone booth on Ireland Road in Mishawaka, Indiana during the two weeks following the Americana incident. Twice Van Waeyenberghe appeared at the phone booth, at defendant's request. Wrobel was present, as well, armed with a rifle, but could not manage to get a shot off. On the third

occasion, Wrobel went to the Ireland Road location, but Van Waeyenberghe did not appear.

The next attempt by Wrobel on Van Waeyenberghe's life occurred on Sunday, September 21, 1986 at a phone booth in Wyatt, Indiana. Wrobel arrived at the location, armed with a rifle and a .357 magnum. Van Waeyenberghe arrived at the phone booth thereafter and received a call from defendant at about 10:00 p.m. The defendant said to Van Waeyenberghe, "I hear you've been talking to the feds." At that point, Wrobel shot at Van Waeyenberghe through the phone booth glass. The glass broke, but Wrobel missed hitting Van Waeyenberghe and Van Waeyenberghe emerged with only a small scrape on the back of his head. Twenty minutes later, Van Waeyenberghe called defendant at his home and accused him of being involved in the murder attempt.

Wrobel made a final unsuccessful attempt on Van Waeyenberghe's life in December 1986. On December 13, 1986, defendant called Wrobel and told him to "get the job done" and that if anyone was with Van Waeyenberghe to "kill them both." The following Monday, December 16, defendant called Wrobel and Wrobel informed him that the job was still not done because there had been too many people around. Defendant again urged Wrobel to get the job done quickly.

On December 17, 1986, Wrobel was arrested, based on information provided to the government by one of his employees, Harry Dieter. Dieter had worked with the government to obtain a tape recording of Wrobel confessing to having shot at a person at the Wyatt phone booth. After his arrest, Wrobel, along with Van Waeyenberghe (who was in protective custody at the time) cooperated with the government in securing the following tape-recorded evidence which resulted in defendant's arrest. On December 18, 1986, defendant spoke on the telephone to Wrobel, who asked him to find out where Van Waeyenberghe was. Defendant then called Van Waeyenberghe and was told by the victim's wife that he was out of town. Defendant immediately

called Wrobel back. Wrobel asked defendant if there was "any way to get [Van Waeyenberghe] set-up like that Wyatt deal." Defendant said that he wouldn't know that until he found out where Van Waeyenberghe was going to be. That same night Van Waeyenberghe called defendant and told defendant that he would be home the following day, December 19, at about 1:00 p.m. Van Waeyenberghe called defendant the next day and left a message on his answering machine saying that he was back in town and would be at his parents' restaurant that night. Defendant later left a message on Wrobel's beeper informing him that Van Waeyenberghe would be at the restaurant all night. Wrobel and defendant had their final conversation in the evening of December 19. Wrobel told defendant that he was going to need more money and defendant agreed to get him $1,000 by Monday. Wrobel further told defendant that he had a ".303" that he had been practicing with and that he was thinking about using it on Van Waeyenberghe when he walked out of the restaurant. Defendant told Wrobel that he should walk away if there were anyone with Van Waeyenberghe. "Don't take no chances," defendant said. Wrobel then expressed to defendant his fear about carrying out the murder, but said "I need money now, and I think I'm gonna have the guts to do it." Defendant responded, "Okay, that sounds real good, good luck."

### B. *The Indictment and Trial*

On February 5, 1987, defendant was charged, along with Wrobel and one Jimie Ray Estep, in a twenty-four count superseding indictment, with implementing two murder-for-hire schemes. The first six counts pertained to the attempted murder of Van Waeyenberghe described above. The remaining counts pertained to an alleged scheme by defendant and Estep to have one Paul Holland murdered by Wrobel. The trial of the indictment was bifurcated. Wrobel pled guilty to four counts and served as the government's chief witness in both trials. Van Waeyenberghe, who had been granted immunity from pros-

ecution in connection with his tax schemes, also testified.

The first six counts were tried to a jury in July 1987. Defendant maintained throughout the trial that he had hired Wrobel simply to tail Van Waeyenberghe because he was concerned that Van Waeyenberghe would leave the country before the OPEC investigation was concluded. He portrayed Wrobel as a man with severe emotional and psychological disorders who had either imagined or fabricated the existence of a murder contract.

The defense engaged in a vigorous cross-examination of Wrobel to challenge his credibility. In doing so, it relied on two psychological reports. One (the "Springfield Report") was prepared by a psychiatrist who had examined Wrobel at the Federal Medical Facility in Springfield, Missouri. Although the report found Wrobel competent to stand trial, and noted that he had told an essentially consistent story throughout his stay at the facility, it characterized Wrobel as a paranoid individual who suffered from delusions. The second report used by the defense in cross-examining Wrobel (the "Samaritan Report"), was prepared by a social worker who had had several therapy sessions with Wrobel at the Samaritan Center. Wrobel had told the therapists at the Samaritan Center that the devil "had him," that he had seen military battles in Colorado, that he could travel in space without leaving, and that he could move a pencil with his mind. The Samaritan Report concluded that Wrobel suffered a moderate to severe psychological disorder and could be considered a paranoid or schizotype personality.

A major element in the government's case against defendant was the Wyatt phone booth shooting incident. Count 3 of the indictment alleges that "in [sic] or about October 12, 1986" defendant used the telephone to facilitate a murder-for-hire during a conversation between locations in Michigan (where defendant lives) and St. Joseph County, Indiana (where Wyatt is located). This allegation was based on the testimony of a number of witnesses before the grand jury that the Wyatt incident oc-

curred in October. Van Waeyenberghe had testified in the grand jury that the shooting incident occurred on a Sunday evening around 10:00 p.m. on October 12 and that he had circled that date on his calendar. An IRS agent, Clements, also testified in the grand jury that he thought the Wyatt shooting had taken place on or about October 12, 1986.

Defendant prepared for trial on the assumption that the date of the alleged incident was October 12, 1986 and came prepared with an alibi. He and his wife had been in Boston October 10–13 and he had airline ticket receipts to prove it. As the government gathered further evidence, however, it became apparent that the shooting incident had taken place on another Sunday—September 21. Telephone records, which were made available to the defense prior to trial, showed that a call was placed from defendant's home to the Wyatt phone booth at 10:02 p.m. on September 21 and another call was placed from Van Waeyenberghe's residence to defendant's at 10:19 p.m. that same night. A witness had also seen shattered glass in the Wyatt phone booth on September 26, 1986.

At trial, Van Waeyenberghe testified that the Wyatt shooting incident happened within 2½ weeks after his September 5 birthday. He admitted that he had testified as to the October date in the grand jury, but that he had been mistaken. He knew, however, that the incident happened on a Sunday around 10:00 p.m. on a date having a "1" and a "2" in it. IRS Agent Clements also changed his testimony at trial, and stated that based on the telephone and witness reports, he now believed the incident occurred in September. Wrobel testified initially at trial that he had shot Van Waeyenberghe at the Wyatt phone booth on October 1, but after having his memory refreshed with the telephone records acknowledged that the incident happened in September 1986.

The jury found defendant guilty on all six counts of the indictment. Defendant, through his attorney, then filed a "Motion for New Trial" alleging that 1) there was a

fatal variance between the indictment and the proof at trial as to the date of the Wyatt shooting incident, 2) the government had improperly elicited testimony from Wrobel concerning his plea agreement and referred to such agreement in its final argument, 3) the jury should not have been permitted to assess Wrobel's credibility, 4) there was insufficient evidence to support the verdict, and 5) the government engaged in outrageous conduct. The trial court rejected all these arguments and denied the motion. Defendant subsequently filed *pro se* a "Supplementary Motion for New Trial" alleging, among other things, ineffective assistance of counsel. He also filed a "Motion to Dismiss With Prejudice Based Upon Current Newly Discovered and/or Pre–Existing Evidence of Outrageous Government Conduct," and a "Motion To Dismiss Indictment Upon Grounds of Abuse of Grand Jury Process." All three motions were denied by the trial court.

The trial of the remaining eighteen counts of the indictment was held in October 1987. During this trial, Wrobel made additional statements which indicated that he suffered from psychological delusions and that his testimony might not be credible. Defendant and Estep were acquitted on Counts 7–24 of the indictment. Defendant then filed a "Motion for New Trial" on the first six counts alleging, among other things, that the guilty verdict in his first trial was inconsistent with the not guilty verdict in the second trial. The court denied this motion.

On October 30, 1987, the district court sentenced defendant to five years imprisonment on each of the six counts, to be served concurrently. He was also fined $50.00 on each count.

## II

### A. *Variance Between Proof and Indictment*

■ Defendant argues on appeal that the government failed to prove, as alleged in Count 3 of the indictment, that "in [sic] or about October 12, 1986" defendant used the telephone to facilitate the murder-for-hire of Van Waeyenberghe. The incident referred to in this count was the shooting at the Wyatt phone booth. All the evidence the government produced at trial showed that the incident took place on September 21, 1986.

Based on the variance between the allegations in the indictment and the evidence produced at trial, defendant argues that 1) the government failed to prove its case beyond a reasonable doubt; 2) the government withheld information concerning the September 21 date from the defense prior to trial so that the defense could not properly prepare its case; and 3) the grand jury testimony of the government's witnesses as to the October 12 date was perjured and therefore the government engaged in subornation of perjury in permitting the trial to proceed with proof of the September 21 date.

In order to hold that the government failed to prove its case beyond a reasonable doubt, we must find that the variance between the September 21 date proved at trial and the "in [sic] or about October 12" date alleged in the indictment was a material one. We do not find the variance to be material. Unless the particular date is an element of the alleged offense, it is generally sufficient to prove that the offense was committed on any day before the indictment and within the statute of limitations. *Ledbetter v. United States,* 170 U.S. 606, 612–13, 18 S.Ct. 774, 776, 42 L.Ed. 1162 (1898); *United States v. Krepper,* 159 F.2d 958, 964 (3d Cir.1946). Moreover, three circuits have specifically refused to adopt a *per se* rule that the government's failure to allege and prove a single date for an offense results in a material variance whenever the defendant intends to present an alibi defense at trial. *See United States v. Schurr,* 775 F.2d 549, 559 (3d Cir.1985); *United States v. Creamer,* 721 F.2d 342, 343 (11th Cir.1983); *United States v. King,* 703 F.2d 119, 123–24 (5th Cir.), *cert. denied,* 464 U.S. 837, 104 S.Ct. 127, 78 L.Ed. 2d 123 (1983). Instead these courts have held that, in a case involving an alibi defense, a variance in proof of a date is not material unless there is some specific evidence of prejudice. *Id.*

■ Where the indictment alleges that an offense allegedly occurred "on or about" a certain date, the defendant is deemed to be on notice that the charge is not limited to a specific date. He therefore cannot make the requisite showing of prejudice based simply on the fact that the government has failed to prove a specific date. *See Schurr,* 775 F.2d at 559; *Creamer,* 721 F.2d at 344; *King,* 703 F.2d at 124. The courts agree that when the indictment uses the "on or about" designation, proof of a date reasonably near to the specified date is sufficient. *See United States v. Champion,* 813 F.2d 1154, 1168 (11th Cir.1987); *United States v. Grapp,* 653 F.2d 189, 195 (5th Cir.1981). Thus we held in *United States v. Kramer,* 711 F.2d 789, 797 (7th Cir.1983), that there was no prejudicial variance between an indictment which alleged that an offense occurred "on or about September 20, 1977" and the evidence at trial which indicated that the offense occurred a few weeks later.

Here, there was a variance of 21 days between the October 12 date charged in the indictment and the September 21 date proved at trial. These dates were reasonably close, particularly given the "on or about" designation. Moreover, any possible prejudice to the defendant was mitigated by the fact that prior to trial defendant was given access to telephone records showing that a call was made from his residence to the Wyatt phone booth on September 21. Defendant has given no indication that he could have provided an alibi for September 21 had he known earlier that this was the date the government would prove at trial. Accordingly, we cannot say that the variance was material and that the government failed to prove the charges set forth in Count 3 of the indictment beyond a reasonable doubt.

■ Neither do we accept defendant's argument that the government failed to provide defendant with information essential to his defense prior to trial in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The government provided complete discovery to the defense prior to trial, including a record of the September 21 phone call. This call also must have appeared in defendant's own phone records. Defendant therefore cannot claim that he was completely ignorant of the September 21 date prior to trial. Although the government did not inform defendant until just prior to its opening statement that Wrobel and Van Waeyenberghe were going to testify that the shooting took place in September, defendant managed to cross-examine these witnesses extensively on the date discrepancy for purposes of impeachment. Thus, the disclosure did not come "so late as to prevent the defendant from receiving a fair trial." *See United States v. Xheka,* 704 F.2d 974, 981 (7th Cir.), *cert. denied,* 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983); *United States v. Zambrana,* 841 F.2d 1320, 1340 (7th Cir.1988).

■ Defendant's final argument arising out of the date variance is that the government suborned perjury by proceeding to trial on an indictment which was based on "perjured testimony." There is no evidence whatsoever here that any witness committed perjury in testifying before the grand jury that the Wyatt shooting took place in October. Witnesses who testify inconsistently about approximate dates cannot be said to commit perjury. *United States v. Kimberlin,* 805 F.2d 210, 249 (7th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 3270, 97 L.Ed.2d 768 (1987). Thus the government was not obliged to withdraw the indictment in this case nor to call for an *in camera* hearing to determine whether there was probable cause to support the indictment.

### B. *Newly–Discovered Evidence*

■ Defendant argues that there is "newly-discovered" evidence which emerged during the trial of Counts 7–20 and which entitled him to a new trial on Counts 1–6. The "newly-discovered evidence" on which he relies consists of the testimony of Donald Wrobel at the second trial, testimony which would tend to impeach Wrobel's credibility. Wrobel's testimony at the second trial indicated, among other things, that 1) he had made false

statements to the FBI; 2) he believed he was capable of moving objects with his mind; 3) he had gotten little or no sleep during the week immediately before and after his arrest; 4) he was a master and philosophical follower of the martial arts which teach that it is unacceptable to take a human life except in self defense; and 5) his "job" was to make the jury believe he had intended to kill rather than surveil his subjects and that he felt like he was a member of the prosecution team. The second trial resulted in defendant's acquittal.

Defendant infers from these facts that the jury in the second trial acquitted him because it found Wrobel's testimony to be incredible. He argues that had this evidence of Wrobel's lack of credibility been available at the first trial he would have been acquitted on Counts 1–6 as well. He therefore claims that he is entitled to a new trial.

In order to obtain a new trial on the basis of newly-discovered evidence which was not suppressed, "a defendant must show that the evidence in question 1) came to the defendant's knowledge only after trial; 2) could not have been discovered sooner through the exercise of due diligence; 3) is material, and not merely impeaching or cumulative; and 4) would probably lead to an acquittal in the event of a new trial." *United States v. Goodwin,* 770 F.2d 631, 639 (7th Cir.1985), *cert. denied,* 474 U.S. 1084, 106 S.Ct. 858, 88 L.Ed.2d 897 (1986). Defendant claims that because the first jury had to believe Wrobel in order to convict defendant, that evidence revealing Wrobel's lack of truthfulness or credibility was material and not merely cumulative or impeaching.

The government argues, on the other hand, that defendant's evidence strictly relates to the issue of Wrobel's credibility. The government correctly points out that even in the first trial the defense presented evidence concerning Wrobel's credibility. Wrobel was extensively cross-examined based on the Springfield and Samaritan Reports of his paranoid and delusional behavior. Moreover, the government's case against defendant was based not only on Wrobel's testimony, but on tape-recorded statements of the defendant himself. In light of these facts, we must characterize the "newly-discovered evidence" as merely cumulative and impeaching in nature. Even if it were material, we cannot say that such evidence would be likely to lead to an acquittal in the event of a new trial.

■ The defendant argues additionally that the government, in violation of *Brady v. Maryland,* improperly suppressed evidence that Wrobel had lied to the FBI in recounting events relevant to the alleged Holland murder scheme. In response, the government asserts that it fulfilled its obligation under *Brady* when it provided defendant with the FBI report in which Wrobel's misstatement appeared. Regardless of whether the evidence was suppressed, we do not find it to be material. Suppressed evidence is material only if it creates a reasonable probability that "the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed. 2d 481 (1985); *United States v. Jackson,* 780 F.2d 1305, 1310 (7th Cir.1986). As we noted above, there was extensive cross-examination of Wrobel to challenge his credibility. Additional questioning on this topic would not have likely changed the outcome of the trial. Moreover, as the government points out, the "suppressed" evidence related to a parallel investigation that was not material to defendant's guilt on Counts 1–6 and indeed might have actually prejudiced his case on those counts.

## C. *Insufficient Evidence to Support Verdict*

■ Defendant maintains that Wrobel's inherently incredible testimony was the only testimony that linked defendant to the murder-for-hire. He therefore argues that there was insufficient evidence to support the jury's verdict. In evaluating this argument, we are bound to affirm the verdict if the evidence, when viewed in the light most favorable to the government, establishes that any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,*

443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Hollins,* 811 F.2d 384, 388 (7th Cir.1987). A defendant who challenges the sufficiency of the evidence therefore "bears a heavy burden," *United States v. Bruun,* 809 F.2d 397, 408 (7th Cir.1987), one which we do not believe was sustained by the defendant in this case.

Defendant is incorrect in asserting that the government's case was based exclusively on Wrobel's testimony. In fact, Wrobel's testimony was corroborated by the independent testimony of Van Waeyenberghe, by telephone records, and by tape-recorded conversations between Wrobel and the defendant. Wrobel testified the defendant arranged to have Van Waeyenberghe at various phone booths, including the one in Wyatt, Indiana, and Van Waeyenberghe testified he went to these phone booths at defendant's request. Wrobel testified that he shot at Van Waeyenberghe at the Wyatt phone booth and Van Waeyenberghe testified that he was shot at while in the Wyatt phone booth speaking to the defendant. The toll records further indicate defendant called the various phone booths, including the phone call to Wyatt the evening of September 21. Shattered glass in the Wyatt phone booth was seen on September 26. Van Waeyenberghe said he called defendant from his residence shortly after the shooting. Wrobel testified that the defendant told Wrobel that the victim called the defendant about twenty minutes after the shooting. The telephone records established that these calls were placed. Wrobel and Van Waeyenberghe had each independently told other persons about the Wyatt shooting, prior to learning of the murder-for-hire investigation. In addition, there are tape-recorded conversations in which the defendant agreed to try to set up Van Waeyenberghe "like the Wyatt deal" and wished Wrobel "good luck" on his mission.

Thus, the government did not rely exclusively on the testimony of Wrobel in presenting its case. In addition, the defense had ample opportunity to challenge Wrobel's credibility at the first trial. It cross-examined him extensively, relying upon the Springfield and Samaritan Reports which characterized Wrobel as mentally and emotionally disturbed. The jury considered all of this evidence and still found the defendant guilty. Given the substantial corroboration of Wrobel's testimony and the somewhat preposterous story offered by the defendant, it is fair to say that a rational trier of fact could have found defendant guilty beyond a reasonable doubt.

D. *Reference by Government to Wrobel's Guilty Plea*

Defendant makes various allegations of government misconduct including perjury of government agents, failure to disclose exculpatory and impeachment evidence, subornation of perjury, intimidation of witnesses, and failure to disclose promises it made to Wrobel outside of the plea agreement. The first three of these allegations have been discussed above and rejected. The allegations of witness intimidation and undisclosed promises are not supported by specific facts and therefore will not be considered here.

Defendant's final allegation of government misconduct is that the government improperly referred to Wrobel's guilty plea during its closing argument. Specifically, the government stated: "The testimony of Mr. Wrobel was, that he entered a guilty plea of guilty to four charges and he faces 20 years." In doing so, the government did nothing more than repeat testimony which it had properly elicited from Wrobel on direct examination. *See United States v. Davis,* 838 F.2d 909, 917–18 (7th Cir.1988) (holding that the government may bring out on direct examination of a witness the terms of the plea agreement, including that the witness pled guilty to crimes defendant is on trial for). We have held that such testimony is not inherently prejudicial provided that the court gives a cautionary instruction to the jury that it may not consider the witness' guilty plea as evidence against the defendant. *See United States v. Thomas,* 774 F.2d 807, 809–10 (7th Cir.1985). The trial court here gave such a cautionary instruction to

the jury during Wrobel's testimony and again just prior to their deliberations. We therefore find that the government's reference to Wrobel's guilty plea was not prejudicial and the trial court properly denied a mistrial on that basis.

### E. *Ineffective Assistance of Counsel*

Defendant claims that he was denied effective assistance of counsel in violation of his sixth amendment rights. It is well settled that a defendant who raises the claim of ineffective assistance of counsel must prove both that his counsel's performance was deficient and that such performance so prejudiced the defense as to deprive defendant of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *Jarrett v. United States*, 822 F.2d 1438, 1441 (7th Cir.1987).

Defendant primarily faults his attorney, Gerald Werksman, for failing to make a thorough pre-trial investigation of the facts and to make proper discovery requests. He alleges that had his counsel been more zealous in preparing for trial, he would have discovered the date variance in Count 3 of the indictment and would have obtained important exculpatory evidence such as that relating to Wrobel's psychological background. He also alleges that his counsel failed to present the defense of outrageous government conduct.

In denying defendant's request for a new trial based on ineffective assistance of counsel, however, the trial court determined, based on first-hand observation, that Attorney Werksman's performance was not deficient. Indeed, the court referred to Werksman as "a highly talented and very experienced criminal defense attorney" who had "made a massive frontal assault on the credibility of Donald Wrobel." Contrary to defendant's assertion, a general request for *Brady* material was made by his counsel on February 20, 1987 and much of the evidence defendant claims was withheld by the government, *i.e.*, the Springfield and Samaritan Reports, was in fact produced prior to trial. Indeed, Werksman's cross-examination of Wrobel was based extensively on these reports. Werksman also made claims of outrageous government conduct in a "Motion for New Trial" which was rejected by the district court.

Defendant also faults Werksman for stating to the jury during closing argument that he had drunk a large quantity of "Crown Royal" the night before. This statement, he argues, suggested to the jury that Werksman was not committed to his client's defense. It is not clear what was the purpose of the "Crown Royal" reference in Werksman's closing argument. We cannot say, however, that this remark alone rendered Werksman's otherwise competent performance deficient.

As a criminal defense attorney himself, defendant was perhaps more inclined than the ordinary client to scrutinize and second-guess the tactical decisions of his counsel. Matters of trial strategy, however, must be left to trial counsel's discretion. *See Taylor v. Illinois*, — U.S. —, 108 S.Ct. 646, 657, 98 L.Ed.2d 798 (1988). Defendant has pointed to nothing in his attorney's performance which suggests that his representation was constitutionally deficient. The mere fact that defendant was acquitted in his second trial while represented by another attorney does not prove that he was ineffectively represented at his first trial.

### III

### CONCLUSION

For the reasons stated above, we affirm the judgment of the district court.