**UNITED STATES of America, Plaintiff,**

v.

**Isiah KITCHEN, Defendant.**

No. 89 Cr 908.

United States District Court,
N.D. Illinois,
Eastern Division.

July 25, 1994.

William Hogan, Theodore Poulos, Asst. U.S. Attys., Office of U.S. Atty., Chicago, IL, for plaintiff.

Jack P. Rimland, Chicago, IL, for defendant.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge, Sitting by Designation.

The undersigned Judge was responsible for the trial of this defendant in Chicago, Illinois during seven trial days between December 1 and 10, 1992. On December 10, 1992, the defendant, Isiah Kitchen, was found guilty by a jury trial of Counts 56 and 62 of Indictment No. 89 CR 908. Count 56 charged the defendant with possession of 2006 grams of a mixture containing cocaine, with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). Count 62 charged the defendant with possession of two firearms, having been previously convicted of a felony, in violation of 18 U.S.C. § 922(g)(1).

The defendant filed a motion pursuant to Federal Rule of Criminal Procedure Rule 33.[1] Fed.R.Crim.P. 33 provides:

1. The defendant filed a notice of appeal on April 1, 1993. His appeal is presently pending in the Court of Appeals under case number 93–1828. "The district court has no authority to grant a

The court on motion of a defendant may grant a new trial to that defendant if required in the interests of justice.... A motion for a new trial based on the ground of newly discovered evidence may be made only before or within two years after final judgment, but if an appeal is pending the court may grant the motion only on remand of the case. A motion for a new trial based on any other grounds shall be made within 7 days after verdict or finding of guilty or within such further time as the court may fix during the 7–day period.

*See Federal Rules of Criminal Procedure* Rule 33. In evaluating a motion under Fed. R.Crim.P. 33 to set aside a verdict on the basis of newly discovered evidence, "[c]ourts exercise great caution ... because of the importance accorded to repose, regularity of decision-making, and conservation of judicial resources." *United States v. Young,* 20 F.3d 758 (7th Cir.1994) (citing *United States v.*

*Kamel,* 965 F.2d 484, 490 (7th Cir.1992)). In evaluating a Fed.R.Crim.P. 33 motion, the Seventh Circuit "has established a four-part test a defendant must satisfy to establish his right to a new trial." *Id.* "Specifically, the defendant must show that the evidence upon which he relies: (1) came to his knowledge only after trial; (2) could not have been discovered sooner had due diligence been exercised; (3) is material and not merely impeaching or cumulative; and (4) would probably lead to an acquittal in the event of a new trial." *Id.* (quoting *Jarrett v. United States,* 822 F.2d 1438, 1445 (7th Cir.1987)).

In moving for a new trial under Fed. R.Crim.P. 33, the defendant raises two claims in his motion. First, the defendant asserts that witness Lawrence Griffin received unauthorized payments in the form of witness fees that constituted "undisclosed benefits.[2]" Second, the defendant argues

---

new trial once the notice of appeal has been filed." Charles A. Wright, *Federal Practice and Procedure: Criminal 2d* § 557. "It may, however, hear the motion, and certify that it is inclined to grant it." *Id.* "The appellate court, if it is advised of the pendency of such a motion in the trial court, may hold decision of the appeal in abeyance until the district court has either denied the motion or indicated its intention to grant it." *Id.* "If the trial court does indicate that it is inclined to grant the motion, the appellate court will ordinarily remand the case to the trial court for that purpose, and for the new trial, without passing on the merits of the new trial motion." *Id.* Therefore, this court has jurisdiction to entertain a motion for a new trial under Fed.R.Crim.P. 33, and either deny it or certify to the Seventh Circuit, the court's intention to grant the motion. *See United States v. Cronic,* 466 U.S. 648, 667 n. 42, 104 S.Ct. 2039, 2051 n. 42, 80 L.Ed.2d 657 (1984); *United States v. Blankenship,* 970 F.2d 283, 285 (7th Cir.1992); *United States v. Ellison,* 557 F.2d 128, 132 (7th Cir. 1977).

2. This court discussed this issue in *United States v. Kitchen,* 832 F.Supp. 217 (N.D.Ill.1993):

This brings the court to the event which occurred on the final day of this trial after the evidence had all been closed and after an extensive proceeding under Rule 30 of the Federal Rules of Criminal Procedure....

The court now turns finally to the event that took place outside of the presence of the jury on the morning of the last day of trial. Another Assistant United States Attorney came into this courtroom making certain representations as to additional material that had been given out on the government's key witness, Law-

rence Griffin. This court has carefully reviewed the extensive examination of Lawrence Griffin before the court without the presence of the jury in the trial of this case. The court has also made an examination of the total testimony elicited both by the prosecution and defense of Lawrence Griffin before the jury and has made a careful, hopefully minute examination of the testimony that was heard on the last day of the trial outside of the presence of the jury. This court heard that additional out-of-jury testimony, heard the arguments and statements of counsel, carefully reviewed the situation and determined that due process and fairness did not require the reopening of this trial at that belated time to cover subjects that had generally and extensively been covered in the trial before the jury. Admittedly, such is a judgment call, but a review of the record indicates that it is not a judgment call that was made in haste or precipitously, notwithstanding the desire, apparently of all concerned, to get the case to the jury on that particular day. The record will disclose that recesses were had in order to avail defense counsel of an opportunity to prepare and confer, and the court heard ,the statements and arguments of both the prosecution and defense counsel and made a determination that it was not necessary to and it was not prejudicial to refuse to reopen the case at that belated time, despite the request by the defendant that it do so. No doubt, the Office of the United States Attorney for the Northern District of Illinois was being abundantly cautious, as they should be. After reviewing this record and refreshing its recollection, this court is totally and completely comfortable with the decision that was made at that point in the trial.

that government caused the arrest of a potential defense witness Mary Williams, which eventually prevented Mary Williams from testifying on behalf of the defendant.

On the first claim, the government argues that "[b]ecause more than seven days have passed since the jury's verdict in this case, the only new-trial motion under Fed. R.Crim.P. 33 now open to defendant is a motion for a new trial based on the ground of newly discovered evidence." *See Government's Response to Defendant's Motion to Reconsider Post–Trial Motions Based on Newly Discovered Evidence.* Specifically, the government argues that the defendant's "first contention—that witness Griffin received unauthorized payments constituting benefits undisclosed to the defense at trial— is not based upon newly discovered evidence." *Id.*

On this issue, the government maintains that " 'newly discovered evidence' is evidence that 'came to the defendant's knowledge only after trial.' " *Id.* (quoting *United States v. Leibowitz,* 857 F.2d 373, 380 (7th Cir.1988)). To assert this claim, the government explains, the defendant relies on three sources of information and the sources do not meet this definition of newly discovered evidence. The government argues that the FBI 302's, the schedule and postponement procedures in the trial dates, and Mr. Griffin's witness-fee vouchers all fail to meet the definition insofar as the "first and third items were tendered to the defendant at trial on December 10, 1992 [and t]he other item, Kitchen's trial schedule, obviously was known to [the defendant] and his counsel before trial." *Id.*

■ Although this court is inclined to agree with the government on whether this evidence qualifies as newly discovered evidence, this court finds that an evaluation centered upon the question of whether the evidence would lead to an acquittal in a new trial is dispositive.

In *United States v. Young, supra,* a jury convicted the defendant Young of "conspiracy to possess with intent to distribute cocaine and of attempted possession with intent to distribute one kilogram of cocaine, violations of 21 U.S.C. §§ 841(a)(1) and 846." *Id.* At the trial, the jury heard the testimony of a indicted coconspirator named Traylor. Traylor "withdrew his plea of not guilty and pled guilty to the conspiracy count of the indictment." *Id.* "As part of his plea agreement, Traylor agreed to cooperate with the government and testify against Young." *Id.*

Prior to defendant Young's trial, "the government conducted a computer search of both the National Crime Information Center and the Illinois CCH databases for any criminal history of Traylor." *Id.* Additionally, the government checked with the FBI and local law enforcement authorities and questioned Traylor about this issue. "[T]he inquiry revealed only a 1990 misdemeanor shoplifting charge...." *Id.* "The government disclosed Traylor's plea agreement and the results of its criminal history searches to [the defendant] before trial." *Id.*

Subsequent to the conviction, through the efforts of the U.S. Probation Office, the government discovered that Traylor had a criminal record in the state of Mississippi. The government informed the defendant of this discovery and the defendant filed for a new trial under Fed.R.Crim.P. 33. The defendant's "primary argument on appeal is that he should have been granted a new trial because of the late discovery of Traylor's Mississippi criminal record." *Id.*

Initially, in evaluating this claim, the Seventh Circuit reviewed the language of Fed. R.Crim.P. 33 and the four-part test requisite to Fed.R.Crim.P. 33 motions. In evaluating this claim, the *Young* court, speaking through Judge Eschbach, revisited the findings of the district court:

> The district court focused on whether Young satisfied the third and fourth prongs of the test. With regard to the materiality of the new evidence and the probability of acquittal, the district court found:
>
>> The evidence against Young in this case was not limited to Traylor's testimony. The purchase of cocaine from an undercover DEA agent was on videotape and showed Young's active involvement in the transaction. There was also testimony from the DEA agent. Moreover, defense counsel was able to impeach

Traylor based on his admitted involvement in the drug transaction and his self-interest in getting a reduced sentence by testifying against Young. Even assuming that Traylor could have been impeached on the basis of the grand larceny conviction and one or two additional Mississippi convictions, that would only be cumulative impeachment evidence. It cannot be found that this cumulative evidence would "probably" lead to an acquittal. No basis is presented for granting a new trial based on newly discovered evidence.

*Id.*

In affirming the district court opinion, the Seventh Circuit agreed that the dispositive evaluation of this issue rests on an evaluation of two of the factors outlined for consideration of a Fed.R.Crim.P. 33 motion. First, the Seventh Circuit indicated that the defendant "has failed to demonstrate that the new evidence of Traylor's Mississippi offenses, provided they were even admissible for impeachment purposes, would have been anything other than cumulative impeachment evidence." *Id.* More importantly, the Seventh Circuit explained that the defendant "has failed to show that the newly discovered evidence would probably lead to his acquittal in the event of a retrial." *Id.* On this issue, the *Young* court explained:

> Clearly Traylor's testimony against Young was damaging. Traylor testified that Young approached him about obtaining cocaine and that Young was present when he first contacted June. He also testified about his financial arrangement with Young. However, Traylor did not provide the critical evidence of the events in the parking lot where the cocaine deal occurred. Rather the tape recorded conversations, the surveillance videotape, and the testimony of the undercover and surveillance agents provided this evidence. As the district court correctly concluded, the evidence as to Young's guilt was not limited to Traylor's testimony. Even if the evidence of Traylor's Mississippi criminal

record and his dishonesty with the government had been before the jury, it is not probable that Young would have been acquitted.

*Id.*

■ At the criminal trial at issue here, several law enforcement officers testified about the "reverse-buy sting.[3]" The reverse buy sting occurred at Montrose Harbor in Chicago, Illinois, and involved the sale of cocaine to the defendant by law enforcement officers. Here, as in *Young,* Mr. Griffin "did not provide the critical evidence of the events in the parking lot where the cocaine deal occurred." *Id.* In addition, like *Young,* "the evidence as to [Kitchen's] guilt was not limited to [Mr. Griffin's] testimony." *Id.* The testimony of Mr. Griffin at issue here concerned the history of the El Rukns and testimony on several taped phone conversations between Mr. Griffin and the defendant. This court discussed this issue in *United States v. Kitchen,* 832 F.Supp. 217 (N.D.Ill.1993):

> Testimony about the history and activities of the Blackstone Rangers was introduced by Lawrence Griffin. The defendant made a continuing objection to this subject at the time and repeats his objection now. This information was more probative than prejudicial, in part explaining to the jury the connection between Lawrence Griffin and the defendant. To the extent that the defendant complains of his being portrayed as a villain, the witness painted himself with the same brush. This testimony, therefore, was also properly before the jury for the purpose of weighing Mr. Griffin's credibility.

*Id.*

In addition, the defendant took the stand, asserted his innocence, and was extensively cross-examined by the government. As this court stated in *United States v. Kitchen, supra:*

> This jury along with this Judge had an opportunity to see and hear this defendant's testimony and to weigh his credibili-

---

3. There can be no doubt that so-called "reverse buy" controlled substance cases are honored in this circuit. *United States v. Sanders,* 979 F.2d 87 (7th Cir.1992); *United States v. Aguilar,* 948 F.2d 392 (7th Cir.1991), *United States v. Ramos,* 932 F.2d 611 (7th Cir.1991), and *United States v. Cea,* 963 F.2d 1027 (7th Cir.1992).

ty and believability. To the extent that this verdict is based upon a rejection of the basic believability and credibility of this defendant, this court would have arrived at precisely the same conclusion had it been sitting without a jury. The determination of credibility is at the very heart of the jury's function under the Sixth Amendment of the Constitution of the United States. When this defendant's testimony is weighed and considered along with all of the other testimony in the case, there is a firm factual foundation for both verdicts in this case. The key element that was argued as to both charges was the element of possession: in one case, the possession of a firearm and in the other case, a possession of a controlled substance. The evidence as to those elements of possession as to those two charges is clearly sufficient given the inference in favor of those verdicts which prevail at the end of all of the case.

*Id.* (citing *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

This court finds no basis to grant this motion under Fed.R.Crim.P. 33 on the basis of the alleged concerns about Mr. Griffin. This court is aware of the record of appalling misconduct attributable to the government on the El Rukn cases. *See United States v. Burnside,* 824 F.Supp. 1215 (N.D.Ill.1993); *United States v. Andrews,* 824 F.Supp. 1273 (N.D.Ill.1993); and *United States v. Boyd,* 833 F.Supp. 1277 (N.D.Ill.1993). *See also United States v. Bates,* 843 F.Supp. 437 (N.D.Ill.1994). In fact, this trial was pending when the news of this misconduct began to surface and became front page news in the *Chicago Tribune* and the *Chicago Sun Times.* This court had to admonish the jury several times on the issue. These events prompted this court to state "the Assistant United States Attorney who tried this case, along with his supporting staff, were running gun shy when they disclosed information on Lawrence Griffin on December 10 ... [and] ... it would appear that the prosecution in this case bent over backwards to avoid even the remote appearance of making any of the kinds of mistakes of which this prosecutor and his office have been accused in other cases." *See United States v. Kitchen, supra.* On this issue, this court finds no grounds for a new trial under Fed.R.Crim.P. 33.

■ Next, the defendant argues that government caused the arrest of a potential defense witness Mary Williams, which eventually prevented Mary Williams from testifying on behalf of the defendant. The defendant alleges prosecutorial misconduct "that represent[s] the most egregious misconduct by [the government], evidencing a level of misconduct yet unparalleled in the El Rukn prosecutions...." *See Motion to Reconsider Defendant's Post–Trial Motions Based on Newly Discovered Evidence.* Specifically, as advanced by the defendant, the government "launched a sordid plot to subvert justice by providing the Chicago Police Department with information that led to Mary Williams' arrest, while *U.S. v. Kitchen, supra,* was awaiting trial.[4]" *Id.* The defendant main-

4. In their "Motion to Reconsider Defendant's Post–Trial Motions Based on Newly Discovered Evidence," the defendant alleges the following:

> On information and belief, Kitchen concludes that Hogan knew that Williams was to be called as a defense witness and therefore caused information to be supplied to the Chicago Police Department, which neutralized her as a witness for Kitchen. Hogan was privy to this knowledge because on January 17, 1991, Hogan conducted the detention hearing of the defendant before Magistrate Rosemond. It was during this hearing that Mary Williams testified that guns found in her home pursuant to defendant's arrest were hers. These guns were later used as the corpus delicti in charging the defendant with a violation of 18 U.S.C. 924, which ultimately resulted in this defendant's minimum mandatory sentence.

> [The government] used drug purchases from Williams to gain leverage over her by causing her not to testify in Kitchen's trial. Whether the drug purchases are real or fictitious does not matter. The intimidation of a witness and obstruction of the judicial process far outweighs the veracity of the charge. Purchases that were arranged were surveilled by the Chicago Police Department. Harry Evans, one of the El Rukn cooperators, apparently caused to be arranged a drug buy from Williams, with full cooperation from Hogan. This information led to the issuance of a search warrant and charges against Williams. The facts and circumstances surrounding the undercover purchase and subsequent arrest of Mary Williams are more that mere coincidence, it would appear that Hogan, as the master puppeteer of the El Rukn prosecution was able to manipulate certain strings and bring about

tains that the government "knew the chilling effect that criminal charges for drugs and guns would have on Williams." *Id.* Accordingly, as alleged by the defendant, "Williams was subpoenaed to testify for Kitchen in December 1992[, and d]ue to her fears against self-incrimination, she refused to testify at trial that the guns found during the October 5, 1989 search warrant raid were hers as she has testified at the detention hearing." *Id.* Therefore, according to the defendant, the government "had successfully completed [the] mission of eliminating a witness from the defense." *Id.* "This abuse of intimidation of a witness and obstructing the truthful flow of information is just as foul as the allegations of witness intimidation by the El Rukns through their reign of terror." *Id.*

The government strongly objects to this construction of the events surrounding the arrest of Mary Williams. The government asserts that "not a shred of the newly discovered (or any other) evidence shows that Hogan caused Williams' July 1992 arrest." *See Government's Response to Defendant's Motion to Reconsider Post–Trial Motions Based on Newly Discovered Evidence.* More importantly, the government argues that "the trial record shows that Kitchen was not disadvantaged by Williams' July 1992 arrest, which he intended to prove up as evidence of Williams' possession of the gun charged in Kitchen's indictment." *Id.* Finally, according to the government "contrary to Kitchen's assertion, the trial record does not reflect that Williams 'refused to testify' ... or that the July 1992 arrest played a significant role in her failure to testify." *Id.*

Undoubtedly, prosecutors and law enforcement officers often have overwhelming and powerful responsibilities and the seemingly unending resources of the U.S. government. This powerful responsibility when unchecked can be corrupting. This court has already referenced the unfortunate events that precipitated from the actions of unchecked prosecutorial power. In *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed.

1314 (1935), Justice Sutherland explained this awesome responsibility:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Id.*

In *Prosecutorial Misconduct* by Bennett L. Gershman, the author explains that a prosecutor "exercise[s] tremendous power over the defendant's ability to locate, interview, and call witnesses to the stand." Bennett L. Gershman, *Prosecutorial Misconduct* at § 9.10 (Presentation of Evidence). "Prosecutors can instruct witnesses not to talk to the defendant or his counsel, secrete witnesses in undisclosed locations before the trial, obstruct the defendant's access to potential witnesses in other ways, and prevent witnesses from giving testimony for the defense by threatening them with criminal charges." *Id.* "By interfering with the defendant's ability to prepare and present his case the prosecutor may be violating not only the defendant's general due process right to a fair trial but the more specific guarantee contained in the Sixth Amendment." *Id.*

Here, the defendant is arguing that the government interfered with his Sixth Amendment guarantee "to have compulsory process for obtaining witnesses in his favor." *See U.S. Constitution Amendment VI.* "This means that the defendant has a right to

the arrest of Mary Williams and use that card to his advantage in preventing her future trial testimony.

*See Motion to Reconsider Defendant's Post–Trial Motions Based on Newly Discovered Evidence.*

present his defense and to call witnesses favorable to him without interference by the prosecutor or other agencies of government." *Prosecutorial Misconduct, supra.* In *Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), the Supreme Court, speaking through Chief Justice Warren, outlined the Sixth Amendment ramifications of this issue:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

*Id.* See also *Webb v. Texas,* 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972).

An unscrupulous prosecutor has numerous prohibited options to circumvent a defendant's Sixth Amendment rights. "Prosecutors have in various ways frustrated defense attempts to locate and interview witnesses prior to trial.[5]" *Prosecutorial Misconduct, supra.* The most apt comparison to the allegations at issue here involves prosecutorial threats of criminal charges. "[P]rosecutors have intimidated witnesses and prevented them from giving exculpatory testimony for the defendant by threatening them with perjury and other substantive charges." *Id.* "In finding the prosecutor's action improper courts usually inquire whether it 'substantially interfered with any free and unhampered determination the witness might have made as to whether to testify and if so as to the content of such testimony.'" *Id.* (quoting *U.S. v. Thomas,* 488 F.2d 334, 336 (6th Cir.

1973)). "Among the factors relevant to making this determination are the nature of the warning, its extent and timing, its necessity, its effect on the witness' willingness to testify...." *Id.*

This court finds no misconduct of this nature. Specifically, this court finds the defendant's allegations untenable for several reasons. This court notes that allegations based on information and belief are attenuated and unconvincing to this court for purposes of undoing a criminal trial. More importantly, there is no solid evidence of any misconduct of the type outlined in this court's discussion of the prosecutorial misconduct and the Sixth Amendment, only a rather nebulous memo. There is no direct evidence of prosecutorial misconduct. In addition, the memo contains information which does not support the defendant's allegations. The memo was written on August 3, 1993 and the search of Mary Williams house on Campbell occurred on July 28, 1993. The memo indicated that Harry Evans explained that Mary Williams "sold the house on Campbell and was operating out of another building." *See Motion to Reconsider Defendant's Post–Trial Motions Based on Newly Discovered Evidence.* In addition, Harry Evans "want[ed] to know if he can come over this week and he will call his sister and try to set up a buy for us from Mary." *Id.* As the government argues, this "newly discovered evidence concerns a possible *future* drug "buy" from Williams *after* August 3, 1992, at a location *other than* the Campbell residence—a "buy" which apparently never occurred." *See Government's Response to Defendant's Motion to Reconsider Post–Trial Motions Based on Newly Discovered Evidence.*

█ More importantly, in order to find for the defendant not only must this court find that the government has engaged in miscon-

---

**5.** For example, "[c]onvictions have been reversed when the prosecutor in violation of a court order intentionally withheld from the defense a witness's address; held a witness in custody instead of allowing him to talk to defense counsel; subpoenaed a witness and kept her incommunicado to prevent her appearance at trial ..." *Prosecutorial Misconduct, supra.* "Prosecutors have engaged in unprofessional behavior sometimes amounting to constitutional error by instructing witnesses not to talk to defense counsel." *Id.* "Occasionally prosecutors and defense counsel enter into pretrial agreements stipulating that the prosecutor will not object to a continuance to permit defense counsel to finish interviewing witnesses or that authorize defense counsel's access to government witnesses." *Id.* The defendant does not allege any facts tantamount to any of the abovementioned paradigms of prosecutorial misconduct.

duct, *this court must also find that a member of the Chicago Police Department is also engaging in misconduct.* The defendant has attached the "Motion to Suppress Evidence and Request for Hearing Pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)" filed in *People v. Mary Williams.* The motion contains the following allegations:

> The search warrant at issue is attached hereto.... In short, it is based on the allegations of an affiant Nancy Stokilo, who supposedly received information from an unnamed informant. The affiant swears that an informant told her that on July 27, 1992 he visited a house at 6429 South Campbell and purchased cocaine from a person he knew as Mary Williams.

> The information provided to the judicial officer in the complaint for a search warrant was false. Affiant, Officer Stokilo, in attesting to the accuracy of the allegations, knew or had reason to know of the falsehood and nevertheless, whether intentionally, knowingly or with reckless disregard for the truth, ascribed to a false and fraudulent complaint for a search warrant. The false statement were essential to the judge's finding probable cause to search the house at 6429 South Campbell. Setting the falsehoods [a]side, the search warrant complaint fails to state probable cause.

> Based on information collected from the El Rukn investigation, attached hereto ..., there was no informant at the house of Mary Williams on July 27, 1992. Bob, Harry Evans, a government informant in custody on July 27, 1992 most likely provided information to federal prosecutor William Hogan, who used Chicago Police to make and arrange raids. Federal paralegal Luchette Cornda (sic), made a computer entry regarding Mary Williams on August 3, 1992. On information and belief, that entry concerned the raid on Ms. Williams home on July 28, 1992.

*Id.* This court also notes that the defendant only includes this motion and there is no indication of whether the matter was heard or resolved by the Circuit Court of Cook County, Criminal Division. In order to grant the defendant's motion, this court must find that allegations in that motion to be true. This court is not prepared to do so. This court is not willing to ascribe misconduct to the Chicago Police before assigning ulterior motives to Ms. Mary Williams.

In addition, Mr. Hogan was a seasoned prosecutor, however, somewhere along the line he began to succumb to very poor judgement. A lot of hard work has been undone by his poor judgement. This court reviewed the transcript from the detention hearing before Magistrate Judge W. Thomas Rosemond, Jr., and this court frankly doubts that Mr. Hogan harbored any doubts about discrediting Mary Williams in a trial of the defendant. The cross-examination of Mary Williams occurred during the defendant's detention hearing and concerned various articles belonging to the defendant such as a "gold-colored bracelet that belonged to Mr. Kitchen, his driver's license, State of Illinois I.D. card, a variety of other items that were recovered from the bedroom [of the Campbell St. residence] that belonged to Mr. Kitchen...." *See Motion to Reconsider Defendant's Post–Trial Motions Based on Newly Discovered Evidence.* In addition, Mr. Hogan cross-examined Mary Williams on the fact that initially when the search was conducted, she informed the police officers that the guns belonged to the defendant. At the defendant's trial, this cross-examination was conducted by Mr. Hogan on the defendant with equal effect when he took the stand and declared that he did not reside at the Campbell St. residence and that the guns belonged to Mary Williams.

Finally, and perhaps most importantly, the defendants allege that the government engineered the arrest of Mary Williams to prevent her from being a witness at the defendant's trial, yet the defense strategy at one point relied on her arrest to prove up her propensity for firearms. The trial record illustrates defense counsel's strategy:

> Mr. RIMLAND: [Direct testimony by Mary Williams on this abovementioned arrest and search] shows that, number one, that is her residence and remains to be her residence, which will corroborate her testimony. It will corroborate her testimony,

she is going to testify that the two weapons that were discovered in October of '89 were, in fact, hers, or at least one of them was, the other one was a cousin's, and that she did have a weapon for protection, that this would help corroborate, show common scheme, design, the fact that she has, in fact, possessed weapons in that house.

*Id.* It is difficult for this court to ascribe prosecutorial misconduct where the events allegedly engineered inure to the benefit of the defense.

Undoubtedly, the dispositive consideration here is whether the allegations involving Mary Williams, if true, "would probably lead to an acquittal in the event of a new trial." *Id.* (quoting *Jarrett v. United States,* 822 F.2d 1438, 1445 (7th Cir.1987)). This court finds that it would not. More importantly, for purposes of both of the defendant's claims, this court finds that in the "interest of justice," the jury verdicts as deliberated and delivered—guilty on both counts should stand. This court finds no basis for overturning the verdicts on a Fed.R.Crim.P. 33 motion. The motion is DENIED.

IT IS SO ORDERED.